courtdocs@dickinsonwright.com
Carolyn J. Johnsen (#011894)
**DICKINSON WRIGHT PLLC**
1850 N. Central Ave., Suite 1400
Phoenix, Arizona 85004
Phone: (602) 285-5000
Fax: (602) 285-5100
cjjohnsen@dickinsonwright.com
*Attorneys for the Committee*

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 Proceedings |
| FLORENCE HOSPITAL AT ANTHEM LLC, | No. 4:13-bk-03201-BMW |
| Debtor. | |

# DISCLOSURE STATEMENT IN SUPPORT OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS' CHAPTER 11 PLAN OF REORGANIZATION DATED MAY 18, 2015

-1-

# ARTICLE I
# INTRODUCTION

**1.1.** **Plan Proponent**

This Disclosure Statement in Support of the Official Committee *of Unsecured Creditors Chapter 11 Plan of Reorganization* ("**Disclosure Statement**" and "**Plan**") is submitted by the Official Committee of Unsecured Creditors, (the "**Committee**") in this Chapter 11 proceeding. The Committee is the Proponent of the Plan, a copy of which is attached to this Disclosure Statement as **Exhibit A**. The Plan sets forth the means by which Florence Hospital at Anthem, LLC, (the "**Debtor**" or "**FHA**") will be reorganized under Title 11 of the United States Code ("**Bankruptcy Code**").

**1.2.** **Purpose of the Plan and Disclosure Statement**

A Chapter 11 bankruptcy case such as this one culminates with the Bankruptcy Court's approval of a plan of reorganization. This is the document that sets forth how the Debtor will restructure, pay its Creditors, and treat Interests in the Debtor. The Plan in this case sets forth the means for payments and other distributions and describes the structure and management of the so-called "**Reorganized Debtor**" when it emerges from bankruptcy. Readers are specifically directed to Article VIII of this Disclosure Statement that describes how the Plan will be implemented. Creditors are classified according to, among other things, the nature of their Claims, i.e., whether they are secured or unsecured, and Interest Holders are classified according to their treatment under the Plan. The Plan will be sent to Creditors and Interest Holders. Plan approval by the Bankruptcy Court, called "**Confirmation**," creates a binding contract between the Debtor and its Creditors and Interest Holders on the "**Effective Date**" of the Plan. The Plan is the controlling document.

Before the Plan can be sent out to Creditors for a vote, the Plan Proponent must provide Creditors with a Disclosure Statement approved by the Bankruptcy Court. This is a

document which describes the Plan in detail to provide Creditors with meaningful information on which they can base their vote on the Plan. The Disclosure Statement contains a history of the Debtor, the factors leading to bankruptcy, the major events in the bankruptcy proceedings, a description of all the Creditors and the amount of the Claims they are asserting, and other information to support the proposed restructure and payment plan. A hearing will be held by the Bankruptcy Court to determine whether the Disclosure Statement contains sufficient information to allow Creditors to vote on the Plan. Once the Disclosure Statement is approved by the Bankruptcy Court, but not before, the Committee and other parties can solicit Creditors and Interest Holders to vote in favor of or against the Plan.

## ARTICLE II
## VOTING

**2.1.** **Creditors Allowed to Vote: Deadline**

Creditors and Interest Holders holding Allowed Claims and Interests are entitled to vote to accept or reject the Plan, unless the Plan lists them as unimpaired. The Bankruptcy Court will fix a date that will be the last date by which Ballots upon the proposed Plan must be filed with counsel for the Committee as agents of the Bankruptcy Court. **Ballots must be received by Carolyn Johnsen, Dickinson Wright, 1850 North Central Avenue, Suite 1400, Phoenix, AZ, 85004-2554, cjjohnsen@dickinsonwright.com by no later than noon on _____, Arizona Time ("Voting Deadline"). No Ballots received by the above counsel for the Committee after that date will be counted in determining whether the Plan should be confirmed.** If you would like a hard copy of this Disclosure Statement, please contact counsel by e-mail or phone at the address listed above. Even though a Creditor or Interest Holder may choose not to vote or may vote against the Plan, the Creditor will be bound by the terms and treatment set forth in the Plan if the Plan is accepted by the requisite majorities in each Class and/or is confirmed by the Bankruptcy

Court. Creditors who fail to vote will not be counted in determining acceptance or rejection of the Plan. Allowance of a Claim or Interest for voting purposes does not necessarily mean that the Claim will be allowed or disallowed for purposes of distribution under the terms of the Plan. Any Claim to which an objection has been or will be made will be allowed for distribution only after settlement or determination by the Bankruptcy Court. Such determination may be made after the Plan is confirmed.

The Plan must conform to the requirements of 11 U.S.C. § 1129 which include: (1) that with respect to each class of Claims or Interests, each holder of a Claim or Interest has accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest in Property of a value that is not less than the amount such holder would receive if the Debtor were to be liquidated under Chapter 7; (2) that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization; and (3) that the Plan does not discriminate unfairly and is fair and equitable with respect to each class of Claims and Interests that is Impaired under and has not accepted the Plan.

## 2.2. <u>Voting Provisions</u>

In order for the Plan to be deemed accepted by an Impaired Class, under 11 U.S.C. § 1126(c), claimants that hold at least two-thirds (2/3) in the dollar amount and more than one-half (1/2) in the total number of the Allowed Claims in a particular Class voting on the Plan, with timely received Ballots, must accept the Plan.

## 2.3. <u>Definitions</u>

The terms used in this Disclosure Statement have the same meaning as those defined in **<u>Exhibit B</u>** to this Disclosure Statement or in the Bankruptcy Code, Rules, or otherwise defined in this Disclosure Statement.

-4-

## 2.4. Representations Limited

The Committee does not make any representations concerning the Debtor or the Reorganized Debtor particularly regarding future business operations or the value of any assets or equity interests. The information in this Disclosure Statement is derived from information obtained from the Debtor and is accurate to the best of the Committee's belief and knowledge. Other than official correspondence authorized by the Court, you should not rely on any other representations or inducements proffered to you to secure your acceptance in arriving at your decision in voting on the Plan. Any Person making representations or inducements concerning acceptance or rejection of the Plan should be reported to counsel for the Committee and to the United States Trustee. The United States Trustee may be reached at (602) 682-2600. Further, some of the information contained in the Disclosure Statement may consist of projections or estimates regarding future operations or property values. The Committee does not undertake to certify or warrant the accuracy of such information. The Bankruptcy Court has not verified the accuracy of the information contained herein. The Bankruptcy Court's approval of the Disclosure Statement does not imply that the Bankruptcy Court endorses or approves the Plan, but only that the Disclosure Statement contains adequate information for Creditors and Interest Holders to make an informed decision to approve or reject the Plan.

### ARTICLE III
### STRUCTURE OF THE DEBTOR, ASSETS, AND LIABILITIES

## 3.1. The History of the Debtor and its Operations

### A. Concept of FHA

Dr. Timothy Johns ("**Dr. Johns**") founded Florence Hospital at Anthem ("**FHA**") located in Florence, Arizona in 2007 as part of his supposed vision of providing high quality emergency medical care to patients quickly. Prior to developing Florence Hospital, Dr. Johns had developed Gilbert Hospital (also referred to as "**GH**") in 2003, located in

-5-

Gilbert, Arizona with the same model. Each was founded as a hospital in which physicians and nurses controlled the patient experience; a hospital where emergency room patients would wait no more than 30 minutes to be seen by a physician; and a hospital where ambulances would wait no more than 5 minutes to have their patients accepted by the emergency room staff.

As discussed below, Dr. John's alleged "vision" led to bankruptcy for not one, but two hospitals, an investor lawsuit that seriously affected governance of Gilbert Hospital, and a cash drain that led to the failed development of other hospitals. Although Dr. Johns asserts himself to be the manager of FHA, during the Florence bankruptcy, he has absented himself completely. As described in further detail below, he has conflicts of interest by his affiliations with GH and has thereby ignored his responsibility to protect the Florence estate.

The Committee believes that Florence is a viable, stand-alone entity that can generate revenues to pay creditors in full and provide eventual distributions to new equity. The performance of FHA, due to new management beginning in late 2013, has and continues to improve dramatically, irrespective of the mismanagement of Dr. Johns and Gilbert Hospital. This Plan that extricates Florence Hospital from those affiliations benefits the creditors of this estate.

**B.**     **Development of FHA**

In 2007, the mayor of the town of Florence became aware of the GH model, and inquired if Dr. Johns might be interested in a similar facility in Florence, Arizona. A study by Wipfli, LLP ("**Wipfli**"), commissioned by the United States Department of Housing and Urban Development (HUD) but paid for by FHA, verified the need and support for an acute care general hospital in Florence, Arizona. Thus, FHA was formed in November 2007 to own and operate the acute care hospital that is Florence Hospital at Anthem.

**C. The Pre-Development Study and Analysis of Florence Hospital at Anthem.**

Prior to the construction of the FHA Hospital, in April 2009, FHA retained one of the leading CPA and consulting firms in the United States, Wipfli, to conduct a financial feasibility study of FHA's plan to build a hospital in Florence, Arizona. Based on the results of its market demand study, Wipfli concluded that "there is a strong market need in the Florence area for a new hospital." The Committee believes this conclusion exists even more strongly today.

**D. The Acquisition, Development and Construction of the FHA Hospital.**

In 2008, FHA acquired the land upon which the hospital currently sits (the "**FHA Hospital Property**"). Subsequently, in November 2010, FHA entered into several agreements with MPT of Florence, LLC ("**FHA MPT**") to meet FHA's financing needs to construct the FHA Hospital.

Using the funding provided by FHA MPT, FHA constructed the FHA Hospital on the FHA Hospital Property in 2011 and 2012. Construction was completed in February 2012 and the Hospital opened to the public in March 2012. The Hospital is a 36-bed, 96,000 square-foot acute care center with services that include Emergency, Inpatient/ICU, Correctional unit, OR/PACU, MRI, CT, Digital X-ray, Nuclear Medicine, and Ultrasound. The Hospital also has a full-service laboratory, blood bank and inpatient pharmacy.

In addition to its design as an acute care center, the FHA Hospital was specifically constructed with the intention of being used for both emergency and in-patient services by the local prison population of about 19,000. It has a separate state of the art 16 bed unit, for that purpose. Unfortunately, such use has never materialized to the extent anticipated by FHA. FHA has been exploring its possible use as a behavioral health facility that would be more profitable.

-7-

The civilian inpatient unit consists of 20 beds, which are configured to be used for intensive care, telemetry, medical, or surgical. This is a new/innovative bed designation to allow for flexibility. Instead of needing to build 4 separate units, all rooms can be flexed to provide any service. The FHA Hospital offers full surgical services with a fully equipped operating room and a second operating room that is shelled for future expansions. The diagnostic imaging department is full service with state of the art equipment including general x-ray, CT scan, MRI scan, nuclear medicine, and ultrasound. The laboratory is a full service, fully automated laboratory with a full service blood bank. The pharmacy is staffed by pharmacists 24 hours a day.

FHA was initially funded through capital contributions from approximately 57 individual investors who raised approximately $2.8 million. The percentage interests owned by the investors range from as little as a 0.17% membership interest to the 20.27% membership interest owned by Dr. Johns. The initial capital was used to, among other things, pay for the Wipfli 2009 Study and certain other pre-opening costs and expenses of the FHA, including the costs associated with the initial acquisition and development of the FHA land.

### E. Multiple Insider and Affiliate Relationships

Because of the initial profitability of Gilbert Hospital, Dr. Johns created numerous related entities in an attempt to form a network of emergency room based hospitals that would serve underserved suburban areas resulting from the urban sprawl of the 2000's in Arizona. The vision in fact was short-sighted as the cash reserves of GH were depleted to almost zero and consequently, numerous investors in GH brought a lawsuit against Dr. Johns and GH in 2012 in the Maricopa County Superior Court for the State of Arizona, Case No. CV2012-002246 ("**Investor Lawsuit**"). The case has been in mediation under

-8-

the supervision of a special master and the Gilbert hospital's structure and governance are dictated in part by orders entered in that state court case.

Dr. Johns is the largest equity owner in FHA and the FHA Operating Agreement provides that he is the sole manager. Dr. Johns is also the majority member of Gilbert Hospital, with more than a 20% membership interest, and he sits on the five-person management board of GH. Dr. Johns also owns more than 20% of the membership interests in, and is a manager of Peoria Regional Medical Center, LLC ("Peoria"); Buckeye Regional Medical Center, LLC ("Buckeye"); Visionary Health, LLC ("Visionary"); and FHAD Property, LLC ("FHAD"). Peoria and Buckeye are two entities that were formed to own and operate hospitals under the Gilbert Hospital model and to continue the expansion of Dr. Johns' emergency department "vision." To date, neither hospital has been completed nor is operating.

Visionary was initially formed to perform the administrative functions of each of the four hospitals—the Debtor, Gilbert Hospital, Peoria and Buckeye. However, for a variety of reasons, including the Debtor's initial operational struggles and the fact that Peoria and Buckeye were not completed and are not operating, Visionary never took over the administrative functions as anticipated. Rather, as discussed in detail below, the administrative functions of both the Debtor and Gilbert Hospital have been performed by Gilbert Hospital and the expenses associated with those functions were allocated between the two hospitals. In actuality, the two hospitals often had the same managers and operations were not entirely separated.

Additionally, Visionary is a party to the Development Agreement with MPT, discussed above, and Visionary acted as a pass-through for certain land development and entitlement costs incurred in connection with the development and construction of the Hospital. In fact, the Debtor disbursed to Visionary approximately $577,869 in May 2012

and approximately $418,938 in August 2012 which funds were then used by Visionary to pay for land development costs in connection with development and construction. Finally, because it was contemplated that Visionary would perform the administrative functions for all of the hospitals, it is a party to many vendor agreements relating to goods and services provided to the Debtor. In fact, in some instances, the Debtor is not a party such vendor agreements but, rather, is merely referred to as a beneficiary of the agreements.

FHAD was formed to acquire the land upon which the Hospital was constructed. As part of the overall acquisition, development and construction of the Hospital, FHAD negotiated the acquisition of the Land, performed certain entitlement work relating to the FHA Property and, negotiated the MPT transaction discussed above and, ultimately, transferred the FHA Property to the Debtor.

The Committee is investigating whether there are causes of action against any of the related entities described above. These potential actions will be pursued by the Creditor Trustee as described below.

### F. The Gilbert Hospital Relationship

Since the opening of FHA in March 2012, because of their affiliations, certain of the Debtor's administrative functions (*e.g.*, accounting, billing and collections, patient record keeping, information technology services, etc., the "**Administrative Services**") have been performed by Gilbert Hospital staff and resources.

Virtually all of the Debtor's current and historical financial and patient information is located on servers maintained by Gilbert Hospital. While the Debtor has direct access to its patient records on those servers, the Debtor has been dependent upon Gilbert Hospital staff to access the Debtor's accounting, billing and collection information. As set forth below, multiple problems have arisen because Gilbert Hospital failed to perform or overcharged and misallocated costs and fees. After the bankruptcy filing, for example, the

Debtor began making cash payments to Gilbert Hospital for the Administrative Services, which were included in the Debtor's various cash collateral budgets approved by the Court. In fact, between April 18, 2013 and July 11, 2013, the Debtor paid over $311,000 to Gilbert Hospital for the Administrative Services at the rate of approximately $35,000 per week

In early July 2013, the Debtor retained Dave Gonzales of CKS Advisors as its financial advisor. Following his retention, Mr. Gonzales inquired about the payments made to Gilbert Hospital and learned that there is no written contract between the Debtor and Gilbert Hospital regarding the provision of and payment for the Administrative Services. Mr. Gonzales began an analysis of the services provided and amounts paid to determine whether the payments were appropriate and whether the services provided were within acceptable qualitative standards. The data that was provided to Mr. Gonzales to assess the situation was provided by the Gilbert Hospital accounting staff. By early September, Mr. Gonzales had concluded that the Debtor had likely been overpaying for the Administrative Services. Indeed, it appeared that the allocations for Administrative Services were far in excess of the market rates for such services.

Accordingly, Mr. Gonzales and the Debtor's management approached Gilbert Hospital to attempt to reduce the costs. Although Gilbert Hospital agreed to reduce the weekly payments somewhat, the Debtor and Committee believe the cost is still inappropriately high, as it includes an overhead allocation that is not consistent with the realities of the parties' operations. In addition to these amounts paid by the Debtor to Gilbert Hospital, Gilbert Hospital has billed additional amounts that the Debtor has not paid but, rather, has accrued until these issues are resolved. The Debtor believes that it has overpaid an amount equal to or greater than these accruals. Additionally, the qualitative level of the services was, in many respects substandard.

-11-

Certain of the problems are outlined below:

- The financial officer of FHA was the CFO of Gilbert Hospital. FHA had an administrator but he had no managerial or financial background.

- The CFO of GH made all the FHA financial decisions with little to no oversight by the FHA CEO. These included what payables were paid, the amounts to be paid, vendors used, vendor pricing and services, hospital policies and procedures, approving the discounting of accounts receivable, approving contracts at FHA, hiring and firing decisions, design and management of the revenue cycle system.

- All administrative services, accounting, human resources and cash management were performed exclusively by GH for FHA; GH unilaterally made decisions on how much to charge for these services and how to pay itself; there was no contract for these services, rates or agreement on payments.

- The GH CFO made all cash management decisions, cut all checks and checks were signed using a stamp of Tim Johns.

- GH advanced money and services value via a note receivable accounting to pay itself for these services and cash advances.

- GH made decisions on what contract costs it had and what it would allocate to FHA including IT, personnel, software, supplies etc.

  i. GH held an accounting software license that cost $250,000 per annum. GH made the unilateral decision to allocate one half of the cost to FHA.

  ii. GH held various IT licenses under its name. GH would expand the use of their license to FHA operations and then unilaterally allocate part of the GH license cost to FHA.

- The middle management (i.e. chief nursing officer, pharmacy manager, quality manager) of GH held mirror positions at FHA. FHA was allocated part of their salary costs. Very few if any showed up for work at FHA.

- The pre-petition records were not available and the ones supplied did not reconcile or make any business sense.

- Significantly, the post-petition accounting records were manual despite the significant inter-company software charge. FHA was informed that GH would not invest money to fix this accounting issue because it could not recover the fund. Additionally, this mistake could not be corrected because the expensive software used by GH was not usable by any current (including management) staff due to lack of training.

- In December 2013, the FHA spent significant administrative costs to have all accounting functions moved back to FHA. Post-petition, FHA never received

-12-

information on the revenue cycle process used for FHA that was entirely managed by GH. The system post-petition was the same system pre-petition. FHA could not get information regarding the creation of receivables – practice or policy, collections of receivable activity, discounts taken; collection trends; collection policies; cash forecasts. Beginning in the fourth quarter 2013 and through the first quarter of 2014 the Debtor moved all revenue cycle activity (with considerable expense to FHA) out of GH due to the poor performance and the belief that the work was not being done at all.

- FHA was told that returned billing mail was not reprocessed and was instead deposited into a closet ( pre and post), This was somewhat confirmed as close to 10 million in AR was written off as over 365 days old in late 2013.

- The largest owner of FHA is also the largest owner of GH – Tim Johns. Tim Johns is an insider of FHA.

- The CEO of GH was always the CEO of FHA (first Wanger and then Johns). There was never an independent CEO or governance structure

- Total control of the FHA operation pre-petition and poor management drove the FHA into the Chapter 11:

- GH and insiders decided what happened to their " GH loan" (advances and pay downs),

- GH and insiders controlled cash,

- GH and insiders made all FHA business decisions,

- GH and insiders controlled operations,

- GH and insiders controlled the business execution including all administrative functions,

- GH and insiders controlled the business model – how FHA marketed itself including building a prison wing with no customers or contracts,

- There are multiple instances where the management of GH was interlocked (exact same) with FHA

- GH and insiders actively and regularly shifted costs from GH to FHA as a seeming tactic of indirect compensation.

- In essence, GH actively controlled all aspects of the FHA business and this relationship/activity was known and approved by the GH governance board.

- Gilbert Hospital claims it is owed an unsecured pre-petition debt by the Debtor of over $11,000,000. However, this amount is grossly inflated due to improper allocations of the costs for Administrative Services supposedly provided by Gilbert Hospital to the Debtor. In addition, the Debtor has paid approximately $2,216,748.14 ($1,000,000 on April 30, 2012 and $1,216,748.14 on June 6, 2012)

-13-

to Gilbert Hospital on account of Gilbert Hospital's loan to the Debtor in the one year preceding the Petition Date. These funds are clearly recoverable as preferential payments. The facts described above support the disallowance and/or subordination of Gilbert's claim.

### 3.2. The Facilities Lease

As indicated above, FHA entered into various agreements with FHA MPT with respect to the funding of the construction of the hospital facility and to its ultimate lease back to Debtor. The FHA MPT lease has been assumed by the Debtor by Stipulation dated March 10, 2014 which is hereby incorporated by reference. FHA is required to pay FHA MPT approximately $295,000 per month in rent. Other terms include the following:

- Rent Deferral. FHA MPT deferred eight percent (8%) of FHA's monthly base rent payments for a 24 month. FHA must repay this deferral in rent (plus interest) to FHA MPT in thirty six (36) equal monthly installments beginning on the earlier of (i) the first day of the first month after the second anniversary of the Plan Effective Date, or (ii) November 1, 2016 (such earlier date, the "**Repayment Commencement Date**").

- 1/14 Rent Payment. FHA was unable to pay for January 2014 rent (the "1/14 Rent Payment") of more than $313,000. FHA MPT agreed to defer to the earlier of (i) the Plan Effective Date, or (ii) March 31, 2014.

- Accrued Lease Obligations. Prior the FHA Petition Date, there were over $400,000 of unpaid obligations under the FHA MPT Lease. These obligations have been deferred to the Repayment Commencement Date and will be paid in 36 equal monthly payments.

- Real Estate Taxes. FHA was delinquent on real estate taxes under the FHA MPT Lease in the amount of $231,950.95. These taxes were deferred as follows: (i) within thirty (30) days of the order approving the FHA MPT Stipulation FHA was to make a payment to FHA MPT in the amount of $154,633.96; and (ii) on or before the earlier of September 30, 2014 or the date ninety (90) days after the Plan Effective Date, the Debtor will make a payment to FHA MPT in the amount of $77,316.99.

- Letter of Credit. FHA MPT gave an extension of three years after a plan effective date to achieve the required increase in the Letter of Credit under the FHA MPT Lease.

- True Lease. FHA and FHA MPT confirm that (i) the FHA MPT Lease is a true lease, and (ii) FHA MPT is the owner of the Leased Property.

-14-

Under the stipulation FHA MPT was also granted full stay relief and FHA waived any claims it may have against FHA MPT. A hearing was held on the FHA MPT Joint Motion on February 6, 2014 (FHA DE 435). No objections were filed and an order was entered approving the FHA MPT Joint Motion on March 10, 2014 (FHA DE 494).

Following the Bankruptcy Court's approval of the FHA MPT Stipulation, FHA defaulted twice on payments due, and FHA MPT entered into two forbearance agreements. As of the date of this Disclosure Statement, no additional notices of forbearance have been filed. FHA owes the $77,316.99 payment due September 30, 2014, and this amount will be cured promptly.

**3.3.**    **Current Management and Employees**

A.    As of the FHA Petition Date, the FHA's primary management consisted of: (a) David Wanger as Chief Executive Officer, (b) Dr. Johns as Chief Operating Officer, Chief Medical Officer and manager, (c) Dr. Anne Borik as Chief Hospitalist, and (d) Kimberly Fawley as Chief Nursing Officer. Nat Palaniappan, a former employee of GH, acted as assistant Chief Financial Officer for the Debtor, and Ivan Esteban was FHA's Business Operations Administrator.

B.    Shortly after the bankruptcy filing, Mr. Wanger resigned as CEO. Upon Mr. Wanger's resignation, Dr. Johns took over the duties as interim CEO but immediately began a search for a replacement CEO. FHA hired Mr. Arthur Doloresco ("**Mr. Doloresco**") on September 4, 2013 as CEO. Mr. Deloresco is the current CEO and Mr. T. Patrick Clune is the current Chief Financial Officer. Staff consists of approximately 103 employees. There are currently about 157 physicians on staff representing 13 specialties.

C.    In addition to his role as the sole manager for FHA and prior interim CEO, Dr. Johns has also held the roles of Chief Operating Officer and Chief Medical Officer of FHA. Dr. Johns is the largest member of FHA (holding approximately 20% membership

-15-

interest). Dr. Johns has also loaned money to FHA, both pre-petition (in the amount of approximately $33,000) and post-petition (approximately $100,000 which sum he loaned in response to a requirement by the Bankruptcy Court). Dr. Johns also provided funds as retainers to FHA's current counsel ($75,000) and financial advisor ($24,000) from his personal funds without an expectation of being repaid such advances, all by Court requirements. In early July 2013, the Debtor retained Dave Gonzales of CKS Advisors as its financial advisor.

D.      While Dr. Johns remains the sole manager of FHA, he has visited the hospital on limited occasions and has failed to communicate at all with the CEO, the Debtor's counsel and/or the Debtor's financial advisor. His dual affiliation with Gilbert Hospital creates a myriad of conflicts of interest in what is an appropriate course of action in the Florence case. As of the date of this Disclosure Statement, Dr. Johns has fired its counsel and purportedly hired new counsel to carry out his wishes. The Committee is not confident that his wishes are in the best interest of the estate. The Committee believes a chapter 11 trustee should be appointed in the FHA case in order to ensure the estate is protected.

**3.4.    Assets**

The Debtor's assets consist primarily of the following:

**A.      Cash**

As of May 1, 2015, the Debtor had cash on hand of approximately $1,960,518.

**B.      Inventory and equipment.**

In April 2014, Centurion Service Group, LLC, a nationally known medical equipment appraiser valued on an orderly liquidation basis the Debtor's personal property as of August 26, 2013 at $1,072,010. Bank SNB obtained appraisals of the Debtor's personal property, prepared by Rosen Systems, Inc., reflecting the following estimates of

-16-

value: As of 9/3/2013, Fair Market Value of $2,521,08 and Orderly Liquidation Value of $1,383,235

**C.      Accounts Receivable**

As of the FHA Petition Date, the gross amount of accounts receivable owing to the Debtor was approximately $20,342,818. FHA estimates that it collects approximately 22% of its gross receivables. FHA's March Monthly Operating Report shows $21,601,770.14 in total accounts receivables with a net amount of $8 million. In addition, the Committee understands that the Debtor is entitled to Medicare "cost report" funds of approximately $4-500,000.

**D.       "Meaningful Use" Funds**

FHA participates in the federally funded Medicare and Medicaid Electronic Health Records ("EHR") Incentive Program whereby it is entitled to receive incentive payments from the government upon demonstrating its adoption, implementation, upgrading and/or meaningful use of certified EHR technology. The EHR Incentive Program is designed to support health care providers and improve the quality, safety and efficiency of patient health care. FHA's participation in this program recently resulted in the payment of an incentive from the federal government to FHA in the amount of approximately $650,000 (the "Meaningful Use Funds"). These funds are designated to pay for costs entailed in separating its IT from Gilbert Hospital.   FHA may be entitled to receive additional funds in the future under the EHR Incentive Program so long as FHA satisfies its requirements. The situation is a difficult one based on delay in certain upgrades all caused by Gilbert Hospital.

**E.       Deferred Compensation Plan**

Prior to the Petition Date, Mr. Wanger established a deferred compensation plan for himself, Dr. Johns and one other employee. The Committee believes that approximately

$223,000 is held in the deferred compensation plan and that such funds can be made available to pay creditors.

### 3.5. Liabilities

The Debtor's secured debt consists of the following:

A.     Bank SNB Bank (fka Stillwater National Bank and Trust) claims a debt of $9,854,625.06 consisting of two loans, one for $4,827,944.50 and one for $5,026,680.56. In addition, Bank SNB holds a contingent LOC claim in the amount of $1,200,000 related to the MPT Lease.  SNB claims these obligations are secured by all of the assets of the Debtor.

B.     Covidien claims a debt of $4,324 secured by an optivantage injector complete start-up kit.

C.     Dr. Johns claims a debt of $100,000 secured by a junior lien on certain assets of the Debtor.

On the Effective Date, the Debtor believes the administrative claims will consist of ordinary course claims of approximately $750,000 and professional fees for Debtor's counsel Polsinelli, Committee counsel Dickinson Wright, former Committee counsel Jennings Strouss, the Nelson firm, CKS Advisors and CKS Securities, LLC in the total aggregate amount of approximately $2,000,000.00.  A contested Plan Confirmation could increase this number.

Blue Wolf has filed an administrative claim in the amount of $745,000 based on an allegation that it was misled about the Debtors' authority to file the motion to sell the Debtor's assets to it.  The Committee does not believe the claim is valid and disputes it.

Gilbert Hospital has filed an administrative claim in the amount of $1,300,751.74 based on IT services it allegedly provided the Debtor over the course of the bankruptcy. The Committee does not believe the claim is valid and disputes it.

The Debtor has general trade debt of about $1-1,500,000, disputed insider debt to GH of about $10,800.000, disputed insider debt to Dr. Johns of about $150,000, and disputed and contingent indemnity claims by insiders of about $2,600,000.

### 3.6. <u>Over all Operational Turnaround</u>

The incumbent CEO assumed responsibility for operations in September 2013. Since that time he and his staff reorganized all compliance, clinical operations, revenue recognition, revenue collection, accounting process, marketing outreach and business model development. The positive impact has been EBITDA of $2,959,000 for fiscal year end 2014 and $965,000 for the first quarter of 2015. Projections are that EBITDA will at least remain in the $4 million range and possibly increase to $6 million.

**ARTICLE IV**
**FACTORS LEADING TO DEBTOR'S BANKRUPTCY AND OTHER**
**PRE-PETITION EVENTS**

Factors leading to FHA's bankruptcy filing include (a) the unexpected opening of a competing hospital in Florence and initial animosity toward FHA by local physicians and other medical personnel; (b) the failure by the local prisons to use FHA's facility for their emergency and inpatient services; (c) revenues that did not match projections mainly due to burdensome contracts; (d) mismanagement by previous FHA management and by Gilbert Hospital.

For the most part, these situations have been remedied and the business has turned around dramatically (See section 3.6 above). The competing hospital has been closed and FHA has gained the support of local doctor sources. Although the Hospital is still not used by the prison system, current management is pursuing use as a behavior facility.

FHA's initial projected revenues did not come to fruition based principally on the existence of certain burdensome contracts with three major health insurance companies:

Blue Cross Blue Shield, Aetna Health, Inc., and Healthnet of Arizona, Inc. (collectively, the "**Insurance Contracts**").

The Insurance Contracts resulted in a loss to FHA of an estimated $2,185,053 in possible increased cash reimbursements during 2013 alone. Therefore, FHA sought and was granted authority to reject the Insurance Contracts. FHA's revenues have already increased as a result of the rejection of these contracts.

As set forth in greater detail in Section 3.1F of this Disclosure Statement, previous management and Gilbert Hospital greatly mismanaged Florence Hospital. FHA was vastly and systematically over-charged for supposed administrative costs and drained to monies to which it was entitled. This Plan will alleviate these problems with the separation of Gilbert and Florence. (See section3.6 above describing the turnaround for Florence in the last year.

Finally, the immediate impetus for the bankruptcy filing was FHA's concern that FHA MPT was going to exercise its alleged rights and remedies under the FHA MPT Lease Documents. Specifically, MPT asserted that, under the FHA MPT Lease, FHA was required to increase a letter of credit obtained from Stillwater, under which FHA MPT is the beneficiary, by approximately $600,000. FHA was not able to secure the required increase in the letter of credit, and therefore, was concerned that FHA MPT would declare a default under the FHA MPT Lease Documents and take control of the FHA Hospital. FHA filed its bankruptcy petition to, among other things; obtain the benefit of the automatic stay to prevent such an action.

Debtor filed for protection under Chapter 11 of the Bankruptcy Code on March 6, 2013.

Approximately one year later on February 5, 2014, Gilbert Hospital filed bankruptcy. The factors leading to its filing included the following: During 2013, GH

experienced a transition period with a gap in leadership. It suffered the residual impact of the disputes that led to the Investor Lawsuit, and specifically, GH did not have a sufficient operating cash reserve. The lack of business leadership and internal conflict led to poor collections and GH was unable to maintain current on its operational expenses.

In January of 2014, three devastating events occurred that lead GH to seek bankruptcy protection. First, GH was unable to pay the January 2014 rent to landlord GH MPT under the terms of the GH MPT Lease. This led GH MPT to declare a default that allegedly was not timely cured and allegedly terminated the GH MPT Lease. Second, Bank SNB, foreclosed on the certain property. And, third, Bank SNB conducted a sweep on three consecutive days of GH's deposit accounts, leaving GH with less than $4,000 in operating capital. GH sought bankruptcy protection in part to seek the protection of automatic stay under 11 U.S.C. §362 to stop further collection actions of Bank SNB and to prevent GH MPT from taking action to evict GH.

## ARTICLE V
## SIGNIFICANT BANKRUPTCY EVENTS

**5.1.** **Bankruptcy Filing**

The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on March 6, 2013 (the "**Petition Date**"). Since the Petition Date, Debtor has operated its business as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

**5.2.** **Creditors' Meeting and Creditors' Committee.**

The United Stated Trustee ("UST"), in the FHA Bankruptcy, appointed an unsecured creditors committee on March 27, 2014 (FHA DE 64). (The "FHA Committee").

**5.3.** **Employment of Professionals**

The following chart summarizes the professionals employed in the FHA Bankruptcy. The Court also approved the employment of ordinary course professionals (FHA DE 73).

-21-

| Name of Firm | Role | Application Date & DE | Order Date & DE |
|---|---|---|---|
| Allen, Maguire & Barnes | Counsel to PCO | 12/26/2014 FHA DE 689 | 1/24/2015 FHA DE 747 |
| Allen, Sala & Bayne, PLC | Former Counsel to FHA | 3/6/2013 FHA DE 3 | 3/12/2013 FHA DE 41 |
| Asset Based Capital Healthcare, LLC | Broker for FHA | 1/30/2014 FHA DE 451 | 2/11/2014 FHA DE 480 |
| The Cavanagh Law Firm, P.A. | Former Counsel to PCO | 4/30/2013 FHA DE 115 | 5/7/2013 FHA DE 129 |
| Centurion Service Group, LLC | Appraiser for FHA's Personal Property | 7/26/2013 FHA DE 230 | 8/7/2013 FHA DE 268 |
| CKS Advisors, LLC | Financial Adviser to FHA | 7/1/2013 FHA DE 165 | 7/11/2013 FHA DE 202 9/9/2013 FHA DE 310 |
| CKS Securities, LLC | Investment Banker to FHA | 4/2/2014 FHA DE 505 | 4/14/2014 FHA DE 514 5/23/2014 FHA DE 538 |
| Dickinson Wright PLLC | Counsel to Committee | 6/17/2014 FHA DE 546 | 6/21/2014 FHA DE 556 |
| *Harlan Scott Roman* | *Attorneys to FHA* | *3/6/2013 FHA DE 16* | *3/28/2013 FHA DE 73* |
| Jennings, Strouss & Salmon, P.L.C. | Former Counsel to Committee | 4/9/2013 FHA DE 86 | 4/11/2013 FHA DE 91 |
| *Lake & Cobb, PLC* | *Attorneys to FHA re Wentworth Case* | *3/6/2013 FHA DE 16* | 3/28/2013 FHA DE 73 |
| *Nelson Law Group, PLLC* | *Attorneys to FHA* | *3/6/2013 FHA DE 16* | *3/28/2013 FHA DE 73* |
| *Paul D. Ellsworth PLC* | *Attorneys to FHA* | *3/6/2013 FHA DE 16* | *3/28/2013 FHA DE 73* |
| Polsinelli PC | Counsel to FHA | 7/9/2013 FHA DE 189 | 7/10/2013 FHA DE 198 9/9/2013 FHA DE 310 |
| *Schmidt Westergard & Company, PLLC* | *Accountant to FHA* | *3/6/2013 FHA DE 16* | *3/28/2013 FHA DE 73* |
| Seelig+Cussigh HCO LLC | Consultant to PCO | 5/3/2013 FHA DE 124 | 5/7/2013 FHA DE 130 |

-22-

| Name of Firm | Role | Application Date & DE | Order Date & DE |
|---|---|---|---|
| Seelig, Jerry | Patient Care Ombudsman ("PCO") | 3/21/2013 FHA DE 60 | 4/23/2013 FHA DE 110 |
| *Udall Shumway* | *Attorneys to FHA re HR related issues* | *3/6/2013 FHA DE 16* | *3/28/2013 FHA DE 73* |

**5.4.** <u>**Prior Plans and Disclosure Statements.**</u>

On August 20, 2013, FHA filed its Plan of Reorganization Dated August 20, 2013 (FHA DE 284) and accompanying Disclosure Statement (FHA DE 283). The Debtor filed an Amended Plan of Reorganization Dated November 13, 2013 ("FHA First Amended Plan") (FHA DE 389) with an accompanying Amended Disclosure Statement ("FHA First Amended DS") (FHA DE 388).

On December 13, 2013, the Court entered an Order Approving Amended Disclosure Statement Relating to Debtor's Amended Plan of Reorganization Dated November 13, 2013 ("DS Order") (FHA DE 408). The DS Order provided that an initial confirmation hearing to consider the FHA First Amended Plan would be held on February 6, 2014.

At the February 6, 2014 hearing and in subsequent hearings, FHA reviewed the necessity for new capital under the FHA First Amended Plan and confirmed that no investors had committed funds. FHA informed the Court it would most likely be pursuing a sale process. No amended plan has been filed to date.

**5.5.** <u>**Exclusivity.**</u>

The Debtor filed three motions to extend exclusivity (FHA DE 173), (FHA DE 366) and (FHA DE 416). The first two motions were granted. At a March 6, 2014 hearing the Court confirmed that the exclusive periods in the FHA Bankruptcy were expired (FHA DE 499).

**5.6.** **Stay Relief and Adequate Protection Proceedings.**

    **A.** **Bank SNB.**

On April 22, 2013, Bank SNB filed its Motion for Relief from the Automatic Stay or, Alternatively, to Convert to Chapter 7. Various hearings were held and the Motion has been continued.

    **B.** **MPT of Florence, LLC.**

On June 4, 2013, MPT of Florence, LLC ("FHA MPT") filed its Motion for Relief from the Automatic Stay requesting relief from the automatic stay to pursue its rights and remedies under the FHA MPT Lease Agreement but only to the extent that Bank SNB obtained stay relief ("FHA MPT MFR") (FHA DE 147). On July 30, 2013, the Court entered the Order Granting Motion for Relief filed by FHA MPT (FHA DE 243).

    **C.** **Gilbert Hospital, LLC.**

On December 19, 2013, GH filed a Motion for Relief from the Automatic Stay to Immediately Terminate Providing of Services ("GH MFR") (FHA DE 412). On April 30, 2014, GH withdrew the GH MFR (FHA DE 527).

    **D.** **Gilbert Hospital, LLC Second Motion.**

On June 9, 2014, GH filed its Motion to Confirm the Absence of the Automatic Stay or in the Alternative Lift the Automatic Stay Regarding Hosting Services Provided By Gilbert Hospital, LLC Or in the Alternative Order the Debtor to Make Adequate Protection Payments to Gilbert Hospital, LLC ("GH Hosting MFR") (FHA DE 542). The GH Hosting MFR led to mediation between GH and FHA which is discussed in more detail below.

**5.7.** **Bar Date.**

On August 27, 2013, the Court entered its Order Setting Bar Date For Pre-Petition Claims And Claims Arising From The Rejection Of Unexpired Leases And Executory Contracts setting October 28, 2013 as the bar date for the filing of pre-petition claims

against the Debtor and claims arising from the rejection of unexpired leases and executory contracts.

### 5.8.  Motion for the Appointment of a Chapter 11 Trustee.

On July 26, 2013, Bank SNB filed its Motion for Appointment of Chapter 11 Trustee ("FHA Trustee Motion") (FHA DE 236). Thomas Budnick, James Price, William Voorhaar, Mary Voorhaar, Phyllis Weinstein and Dan Quan, each of whom assert membership interests in the Debtor, filed joinders to the motion to appoint a trustee. FHA opposed the motion and the joinders. A hearing was set for August 27, 2013, but was postponed by agreement of the parties. Bank SNB has withdrawn the FHA Trustee Motion.

### 5.9.  Assumption of the FHA MPT Lease.

Upon motion by the Debtor, the Court entered several orders extending the deadline to assume or reject nonresidential real property leases, mainly the FHA MPT lease. On January 8, 2014, FHA and MPT of Florence, LLC filed a Joint Motion to Approve Stipulation and Agreement Regarding Debtor's Assumption of Real Property Lease and Related Matters ("FHA MPT Assumption Motion") (FHA DE 434). The Court approved the FHA MPT Assumption Motion on March 10, 2014 (FHA DE 494).

### 5.10.  Rejection Motions

**First Omnibus Motion to Reject**:  On July 12, 2013, FHA filed its First Omnibus Motion to Reject Executory Contracts ("FHA First Omnibus Motion") (FHA DE 205), to reject the following executory contracts: a) Aetna Hospital Services Agreement; b) Blue Cross Blue Shield of Arizona Participation Agreement; c) GH Healthcare Services; d) Healthnet of Arizona, Inc.; and e) Krames/Staywell education contact (the "First Omnibus Contracts"). On July 25, 2014, FHA filed a notice of withdrawal for the GH Healthcare Services Contract from the First Omnibus Contracts (FHA DE 226). On August 27, 2014

the Court entered an Order Granting First Omnibus Motion to Reject Executory Contracts (FHA DE 294).

**5.11. <u>Layton Construction</u>**

FHA and FHA MPT entered into a stipulation, and have sought Court approval of such stipulation, to the extent necessary, for certain payments (funded by MPT) to Layton Construction Company of Arizona ("Layton Construction"), a general contractor retained by the Debtor in connection with the construction of the FHA Hospital. Among other things, these payments are designed to prevent a default under the MPT Lease.

**5.12. <u>FHA and GH Hosting Services Mediation</u>**

As discussed above, the Court at a hearing held on June 26, 2014, ordered FHA and GH to mediation on the GH Hosting Motion. GH and FHA attended a meditation on June 30, 2014 to resolve issues related to related to GH providing IT services and hosting services for FHA's electronic data. FHA and GH agreed to an outline of terms at the mediation for the GH's continued hosting of FHA's data with a payment structures and a structure for unbundling GH and FHA's hosted data. These agreements were memorialized in a hosting agreement which is still in effect.

**5.13. <u>Pre-Petition Wage Claims</u>**

On March 6, 2013, FHA filed its Emergency Motion to Approve Interim and Final Orders Authorizing Payment of Pre-Petition Wages, Benefits, and Reimbursement of Certain Other Employee Related Claims ("FHA Wage Motion") (FHA DE 6). A final order was entered authorizing FHA to pay unpaid claims of its employees for healthcare benefits, and paid time off.  (FHA DE 73, 80).

**5.14. <u>Post-Petition Financing</u>**

On April 3, 2013 FHA filed its Emergency Motion for Order Authorizing Debtor-in-Possession Financing to pay its annual insurance premiums (FHA DE 74). The Court

-26-

entered its Order Granting Emergency Motion for Order Authorizing Debtor-in-Possession Financing on April 11, 2013 (FHA DE 92).

On May 24, 2013, FHA filed its second Emergency Motion for Order Authorizing Debtor-in-Possession Financing requesting authority to obtain post-petition financing from Dr. Johns, in the amount of $100,000, to fund a retainer to ASB and to fund operations (FHA DE 138). After hearing held on May 30, 2013, the Court entered its Order Granting Emergency Motion for Order Authorizing Debtor-in-Possession Financing on June 6, 2013 (FHA DE 154).

On July 9, 2013, FHA filed its Emergency Motion For Order Authorizing An Increase In Debtor-In-Possession Financing Provided By Dr. Johns seeking authority to increase the post-petition loan from Dr. Johns by $99,000 to provide the retainers to Polsinelli and CKS (FHA DE 193). After a hearing regarding such request, the Bankruptcy Court denied the request and placed certain conditions on the requested post-petition financing. Dr. Johns and the Debtor subsequently withdrew the request for additional financing, and Dr. Johns funded the retainers to Polsinelli and CKS, from his personal funds, without the expectation of being repaid (FHA DE 216).

On March 28, 2014, FHA filed its Emergency Motion for Order Authorizing Debtor-in-Possession Financing to Finance the Debtor's Insurance Premiums (FHA DE 502). On April 22, 2014, the Court granted the motion to authorize post-petition financing to finance insurance premiums (FHA DE 521).

## 5.15.  <u>Cash Collateral Issues</u>

The Debtor filed numerous motions to use cash collateral.  FHA continues to have the limited use cash collateral to pay ordinary course expenses with the approval of Bank SNB. FHA pays to Bank SNB monthly adequate protection payments in the amount of $40,000.

On October 31, 2014, FHA filed an Emergency Motion to Authorize the Use of Cash Asserted to be the Collateral of Bank SNB to Complete the Debtor's Creation of an Independent Information Technology System (FHA DE 619). A hearing was held on this motion and was continued to December 10, 2014. The matter was not resolved and so, the Debtor renewed its motion on March 27, 2015. The parties are negotiating a stipulated motion.

### 5.16. <u>Section 363 Sale Motions</u>

#### A. <u>Terner Capital Group, LLC Proposed Sale</u>

On June 11, 2014, FHA filed the FHA Sale Motion. The FHA Sale Motion detailed a proposed sale of "all or substantially all of Debtor's assets pursuant to an Asset Purchase Agreement incorporating either (a) the general terms of that certain Letter of Intent to Acquire the Operating Assets of Florence Hospital at Anthem ("FHA") ("Terner LOI") submitted by Terner Capital Group, LLC (the "Stalking Horse Bidder" or "Terner") or (b) the terms of the Prevailing Bid... submitted by the Prevailing Bidder at the Auction." See, FHA Sale Motion, pg. 3, ¶ 6. The Terner LOI proposed that Terner would purchase all of the assets of FHA for $7,500,000. At a hearing held on June 26, 2014, FHA reported that Terner had negotiated a revised letter of intention ("Revised Terner LOI") (FHA DE 557) in which Terner would purchase all of FHA's assets for $5,750,000 and asked that the Court approve the Revised Terner LOI (FHA DE 574). A stipulated bidding procedures order was circulated among the interested parties and submitted to the Court, however, because FHA did not file an asset purchase agreement with Terner, the Court never signed the bidding procedures order and the sale process with Terner was no longer pursued.

#### B. <u>Blue Wolf Capital Fund III, L.P. Sale Process</u>

On September 25, 2014, FHA filed a Notice of Filing: 1) Letter of Intent From Blue Wolf Capital Fund III, L.P.; 2) Proposed Form Asset Purchase Agreement Regarding the

-28-

Sale of the Debtor's Assets; and 3) Proposed Order Establishing Bid Procedures, Setting Date and Time of 2 Sale Hearing and Setting Related Deadlines (FHA DE 594) ("Blue Wolf Notice")[1] . The Letter of Intent ("LOI") from Blue Wolf Capital Fund III, L.P. ("Blue Wolf") (the, "Blue Wolf LOI") proposed to purchase substantially all of the assets of FHA for $5,000,000 ("Blue Wolf Sale"). The Blue Wolf LOI also included "bid protection" in the amount of $300,000 (the "Cost Reimbursement"). A hearing was set on the Blue Wolf Notice for October 2, 2014 to allow the Court to consider the proposed bidding procedures and sale process.

Numerous hearings were held and the Court eventually approved the bidding procedures on October 17, 2014 (FHA DE 613) (the "FHA Sale Procedures Order").

Pursuant to the Sale Procedures Order, the Debtor filed notices of contracts to be assumed by Blue Wolf. On December 3, 2014, FHA filed Notice of: (1) Blue Wolf Capital Fund III, L.P.'s Intent to Proceed with Acquisition of Hospital; (2) Filing Executed Asset Purchase Agreement Between the Debtor, as Seller, and Blue Wolf Capital Fund III, L.P., as Buyer; and (3) Improvement of Consideration to be Provided to the Debtor's Estate as Set Forth in the Asset Purchase Agreement (the "APA Notice") (FHA DE 645).

Certain parties requested scheduling orders and expedited hearings, however the Court denied the requests and confirmed the schedule set forth in the Sale Procedures Order (FHA DE 667).

On December 15, 2014, FHA submitted Notice of: (1) Competing Credit Bid by Bank SNB; and (2) No Other Credit Bids (FHA DE 668).

On January 6, 2015, FHA filed a motion to convert the sale hearing set on January 7, 2015 to a status hearing (FHA DE 715). On January 26, 2015, FHA, Blue Wolf, and the

---

[1] FHA filed an amended LOI on October 10, 2014. The proposed purchase price was not changed in the LOI.

Committee filed a joint motion to continue the January 27, 2015 status hearing (FHA DE 748) which was jointly objected to by GH and Bank SNB (FHA DE 750). The January 27, 2015 hearing went forward. No proffer was made by FHA, but as directed the UST filed a statement regarding administrative expense liability (FHA DE 749), and Bank SNB withdrew its credit bid (FHA DE 752). After hearing further argument and status updates the Court granted FHA's request to again continue the hearing on the FHA Sale Motion as a status hearing to February 11, 2015 (FHA DE 753).

On February 9, 2015, FHA filed a Motion to Vacate/Debtor's Request to Take Sale Proceedings off of the Court's Calendar and to Vacate Hearing on February 11, 2015, Subject to Resetting (FHA DE 760) which was granted by Court order on February 10, 2015 (FHA DE 762). On February 13, 2015, FHA filed Notice that Blue Wolf Capital Fund III, L.P. and MPT of Florence, LLC Have Entered into a Term Sheet Concerning the Assignment of the MPT Lease (FHA DE 764). The FHA Sale Motion remains off calendar and no action has been taken to renew the sale proceedings.

### 5.17. Joint Plan

At an October 6, 2014 hearing on Debtor's Sale Motion, Bank SNB and Gilbert Hospital announced they would be filing a Joint Plan of Reorganization in both the FHA and GH cases. On October 8th, they filed a pleading stating the Joint Plan would be filed on October 17th; on October 27th, they filed a pleading stating the Joint Plan would be filed on November 7th; they filed yet a third pleading stating the Joint Plan would be filed on November 17th. The Joint Plan was filed on November 17th (FHA DE 629), but no Disclosure Statement was filed. The Disclosure Statement was not filed until December 3rd (FHA DE 646), but curiously, Bank SNB did not join in the filing. The Joint Plan and Disclosure Statement were identical in each of the cases.

The Joint Plan provides for a holding company to be established to own both hospitals. In essence the two estates will be substantively consolidated. Bank SNB will have a combined debt of $14,000,000 that will then be secured by all the assets of FHA and GH. The sum of $1million will be paid to Administrative Claimants but it is unclear how they will be made whole since they are owed approximately $2,000,000. The Florence unsecured creditors will be paid over 4 years, pro rata with the Gilbert unsecured creditors.

A hearing of the GH Disclosure Statement was held on February 26, 2015 at which time the Court heard multiple objections and expressed several of her own concerns (FHA DE 791). Subsequently, Bank SNB and GH filed an amended Joint Plan on March 11th and yet a further amendment on May 4th. The Disclosure Statement hearing is scheduled for June 3rd. Thus, in seven months Bank SNB and GH have yet to obtain an approved Disclosure Statement.

**5.18. <u>Motion to Authorize Transfer, Joint Administration and Consolidated Caption.</u>**

On November 24, 2014, GH and Bank SNB filed a Motion for an Order Authorizing and Directing The Transfer, Joint Administration and Use of Consolidated Caption for the Limited Purpose of Consideration of Confirmation of the Joint Plan of Reorganization (the "Joint Admin Motion")(FHA DE 632). The Joint Admin Motion requested an order authorizing and directing the GH Bankruptcy be transferred to this Court (before the Honorable Brenda M. Whinery) to allow for joint administration, the use of consolidated caption and the use of a consolidated mailing list for the limited purpose of consideration of confirmation of the Joint Plan and any amendments to thereto. On December 10, 2014, this Court denied the Joint Admin Motion without prejudice.

**5.19. <u>Stay Relief and Adequate Protection Proceedings - FHA Stipulated Stay Relief Motion</u>**

On February 12, 2015, GH and FHA filed a Stipulated Motion for Relief from the Automatic Stay to Allow Filing of Preference Complaint ("FHA Stipulation") (GH DE

673), to lift the stay to allow FHA to file its preference complaint against GH, stemming from the two alleged preference payments. The FHA Stipulation allows FHA to file its preference complaint to meet its two-year statute of limitations under 11 U.S.C. § 546 but further stipulates that FHA will not pursue the complaint until a determination has been made on the Amended Joint Plan or the FHA Sale Motion is granted. No objection was filed to the FHA Stipulation and an order was entered approving it on March 4, 2015 (GH DE 739).

**5.20. Adversary Proceedings**

    **A.      Adversary Case Number 4:13-ap-00765**

On July 1, 2013, the FHA Committee filed an adversary proceeding against Bank SNB seeking to avoid and recover prepetition transfers, which was assigned case number 4:13-ap-00765 ("FHA Committee Adversary"). Bank SNB filed a motion to dismiss the FHA Committee Adversary with prejudice on August 15, 2014. A hearing on Bank SNB's motion to dismiss was set for October 2, 2014. At the October 2, 2014 hearing, the FHA Committee announced that the FHA Committee Adversary had been settled and the settlement documentation will be forthcoming.

    **B.      Adversary Case Number 4:13-ap-01304**

On December 5, 2013, Khousheh Kian and Kianoush Kian filed a notice of removal of all proceedings related to a pending action in the District Court of Oklahoma County, Oklahoma, Case No. CJ-2013-6279 the substance of which is the Kians' liability under a personal guaranty.

FHA's debt to Bank SNB ("Kian Adversary"). On January 3, 2014, Bank SNB filed a motion to remand. The Court entered an order on September 23, 2014 of potential dismissal because no action has been taken in the Kian Adversary for more than six (6)

-32-

months. As of the filing of this Disclosure Statement, no hearings have been set in the Kian Adversary but it does remain open.

### C.     **Adversary Case Number 4:13-ap-01305**

On December 5, 2013, Khousheh Kian ("Kian") filed a second notice of removal related to a second pending action in the District Court of Oklahoma County, Oklahoma, Case No. CJ-2013- 6275 ('Second Kian Adversary"). On March 7, 2014, Kain withdrew the notice of removal. The Second Kian Adversary was terminated on February 25, 2015.

### D.     **Adversary Case Number: 4:15-ap-00153**

On March 5, 2015, FHA filed an adversary proceeding against GH, Complaint to Avoid and Recovery Preferential Transfers ("GH Adversary"). Per the parties stipulation discussed above, FHA will not proceed in the GH Adversary until a determination has been made on the Amended Joint Plan, or the FHA Sale Motion is granted.

### E.     **Adversary Case Number: 4:15-ap-00164**

On March 6, 2015, FHA filed an adversary proceeding against multiple defendants to avoid and recover alleged fraudulent transfers ("Transfer Adversary"), "in connection with the Defendants' respective redemption, or purported redemption, of their membership interests in the Debtor." See, Transfer Adversary Complaint, ¶ 38.

**ARTICLE VI**
**SUMMARY OF THE PLAN AND THE PLAN PROCESS**

**6.1.**     **Events Leading up to the Plan.**

As described above the Debtor filed an initial Plan of Reorganization in August 2013. Although the Disclosure Statement was approved, the Debtor was unable to acquire the necessary investments required for the Plan to succeed and the Debtor determined it would not go forward with confirmation.

The Debtor then turned to the possibility of a sale and through CKS Securities began marketing the hospital. The Debtor received several offers and opted to sell to

-33-

Terner. That sale failed to materialize and the Debtor then entered into an agreement with Blue Wolf to sell the hospital assets through a Court auction in which Blue Wolf would be the "stalking horse bidder." A myriad of objections to the sale motion were filed focusing mainly on certain legalities relating to the distribution of proceeds and the authority for the Debtor to have authorized the sale in the first place. After multiple hearings, the Debtor simply put the sale on hold.

In the meantime, Gilbert and SNB filed their Joint Plan of Reorganization that provides essentially for the consolidation of the FHA and Gilbert estates. However, after six months of hearings and amendments, a disclosure statement has not been approved. After this incessant delay, the Committee began to entertain the possibility of filing its own plan of reorganization. Committee counsel met with potential investors identified by Mr. Gonzales and CKS Securities. Committee counsel also met with the Debtor's CEO and Mr. Gonzales about a plan of reorganization that could work for FHA. The Committee also considered the possible outcome of the Joint Plan of Reorganization filed by Bank SNB and Gilbert Hospital. The Committee ultimately concluded it would be in the best interests of creditors to present its own Plan.

## 6.2. <u>Review of the Plan</u>

[**<u>NOTE</u>**: Any description of the Plan in this Disclosure Statement is for informational purposes only and does not purport to change or supersede any of the language of the Plan. Each holder of a Claim or Interest is urged to read the Plan carefully with respect to the proposed treatment of their respective Claim or Interest, and, is encouraged to consult with such person's legal counsel. If the Plan is confirmed, it will be binding upon the Debtor, its Creditors, and Interest Holders. **IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN WILL CONTROL.**]

-34-

## ARTICLE VII
## CLASSIFICATION OF CLAIMS AND INTERESTS

Creditors and Interest Holders are grouped in Classes depending on the type of Claim or Interest they have. The following section describes how they will be treated in the Plan. Payments and distributions will be facilitated through a Creditor Trust described in greater detail below.

**(1)    Class 1—Allowed Administrative Expenses**

Allowed Administrative Claims will be paid as follows:

**1A**    Ordinary course of business claims including those amounts owed to ordinary course professionals will be paid as their claims mature;

**1B**    All other Allowed Administrative Claimants including professional fees will receive on the Effective Date or as allowed, their pro rata share of $2 million in cash. The remaining amounts owed to Allowed Administrative Creditors shall be paid in full plus 1.5 percent (l.5%) interest in quarterly installments over a period of 18 months commencing on the first day of the second quarter after the Effective Date.  In addition, Allowed Administrative Creditors will be allocated 15 percent (15%) of the Series A common stock ("**Stock**") in the Reorganized Debtor to be distributed pro rata as per their Allowed Claims.

Allowed Administrative Creditors in Class 1B may elect to receive Stock instead of any cash distributions based on an $8 million valuation. The cash distribution will be adjusted accordingly. In the event the Reorganized Debtor pays Allowed Claimants in Class 1B and Class 3 (described below) within 12 months of the Effective Date, an additional 20 percent (20%) of the Stock will be issued to the CEO and all allocations will be diluted accordingly.

Class 1 is impaired and entitled to vote on the Plan.

**(2)** **Class 2 -- Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment or treatment is ordered by the Bankruptcy Court, in full and final satisfaction, each holder shall be treated in accordance with the terms set forth in Bankruptcy Code section 1129(a)(9)(C). The Debtor believes Priority Tax Claims may consist of personal property taxes of approximately $4,000. Class 2 is not impaired, will not be solicited, and is not entitled to vote on the Plan.

**(3)** **Class (3)– General Unsecured Creditors**

Class 3 consists of the Allowed Unsecured Claims of general unsecured creditors not otherwise classified. Allowed Unsecured Creditors in this Class will be paid in full plus 6.0 percent (6%) interest in quarterly installments over a period of 18 months commencing on the first day of the second quarter after the Effective Date. In addition, Allowed Unsecured Creditors will be allocated 30 percent (30%) of the Series A common stock ("**Stock**") in the Reorganized Debtor to be distributed pro rata as per their Allowed Claims. Allowed Claimants in this Class may elect to receive Stock instead of any cash distributions based on an $8 million valuation. The cash distribution will be adjusted accordingly. In the event the Reorganized Debtor pays Allowed Claimants in this Class and Class 1B (described above) within 12 months of the Effective Date, an additional 20 percent (20%) of the Stock will be issued to the CEO and all allocations will be diluted accordingly.

Class 3 is impaired and entitled to vote on the Plan.

**(4)** **Class 4 –Bank SNB**

Class 4 consists of the Allowed Secured Claim of Bank SNB which claim is believed to be $9,800,000. Bank SNB's debt will be amortized over 15 years at an interest rate of 6 percent (6%) per annum. Principal and interest payments will be made monthly

-36-

commencing on the first day of the second month after the Effective Bank SNB will retain its lien on all assets of the Reorganized Debtor. The Letter of Credit will remain in place. The GH Guarantee will remain in place. In addition to the above, on the Effective Date, Class 4 will receive 5 percent (5%) of the Stock in the Reorganized Debtor.   Any defaults will be strictly payment defaults which may be cured with 15-day notice. Other terms will be generally consistent with the current loan documents. Class 4 is impaired and entitled to vote on the Plan.

**(5)** **Class 5 –Allowed Unsecured Claims of Insiders**

Class 5 consists of the Allowed Unsecured Claim, if any, of Insiders including Gilbert Hospital, the Indemnity Claims and Dr. Johns.  Allowed Creditors in this Class will receive a pro rata share of 30 percent (30%) of the Stock. This Class is impaired and entitled to vote on the Plan.

**(6)** **Class (6) – Covidien**

Class 6 consists of the Allowed Secured Claim of Covidien, in the approximate amount of $4,324, secured by a lien on certain equipment used by FHA in connection with its operations. Covidien will retain its lien and will receive $400.00 on the Effective date, which amount will be applied to the principal balance of Covidien's Allowed Secured Claim. The remainder of the claim will paid in full in equal quarterly installments of principal and interest, accruing at the rate of 6% per annum, over three (3) years, commencing on the first day of the second month after the Effective Date. Reorganized FHA will have the right, in its sole and absolute discretion, to pre-pay the full amount of Covidien's Allowed Secured Claim at any time without penalty. This Class is impaired and entitled to vote on the Plan.

**(7)     Class (7) –Dr. Johns**

Class 7 consists of the allowed secured claim of Dr. Johns. The Committee believes that senior lien(s) fully encumber the assets that secure the Claim of Dr. Johns. As such, the junior lien of Dr. Johns has no value. Therefore, Dr. Johns' Claim against FHA shall be allowed in the amount of $100,000 and shall be treated in Class 5. This Class is impaired and is entitled to vote on the Plan.

**(8)     Class 8—Allowed Unsecured Claim of Glaser**

Class 8 consists of the Allowed Unsecured Claim of Glaser.  The Debtor has turned over the defense and payment of Glaser's claim against the Debtor to the Debtor's insurance company and has allowed, or will allow, Glaser to pursue recovery of his claims against the insurance company. To the extent the Debtor is found liable with respect to Glaser's clams against the Debtor, the Debtor will pay the deductible payable by the Debtor under its insurance policy to Glaser in full and final satisfaction of any and all claims that Glaser has or may have against the Debtor.  This Class is impaired and entitled to vote on the Plan.

**(9)     Class 9–Equity Interests**

Class 9 consists of the equity Interests in the Debtor. These Interests will be cancelled on the Effective Date.

**ARTICLE VIII**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

**8.1.     Overview of the Implementation of the Plan**

The Debtor will emerge as a C Corporation. Its sole director will be the Creditor Trust described below.  The Trustee of the Creditor Trust will serve as the Chairman and Secretary of the Board.  The Articles of Incorporation and By-laws will be provided in a "**Plan Supplement**" to be filed 10 days prior to the first hearing on the Committee's Disclosure Statement.

**On the Effective Date**:

1. The Reorganized Debtor will create the Creditor Trust and will transfer to it $2 million in cash, or such adjusted amount depending on a creditor's election of equity, and all Causes of Action including Avoidance Actions.

2. The cash will be utilized to pay pro rata Allowed Administrative Creditors in Class 1B on the Effective Date or as allowed, with sufficient reserve to pay disputed claims. The remaining amounts owed to Allowed Administrative Creditors shall be paid in full plus 1.5 percent (1.5%) interest in quarterly installments over a period of 18 months commencing on the first day of the second quarter after the Effective Date. In addition, Allowed Administrative Creditors in Class 1B will be allocated 15 percent (15%) of the Series A common stock ("**Stock**") in the Reorganized Debtor.

3. Allowed Unsecured Creditors will be paid in full plus 6.0 percent (6%) interest in quarterly installments over a period of 18 months commencing on the first day of the second quarter after the Effective Date. In addition, Allowed Unsecured Creditors will be allocated 30 percent (30%) of the Series A common stock ("**Stock**") in the Reorganized Debtor.

4. Allowed Claimants in Classes 1B and 3 may elect to receive Stock instead of any cash distributions based on an $8 million valuation. The cash distribution will be adjusted accordingly.

5. Twenty percent (20%) of the Stock will be issue to the CEO Mr. Delaresco and he may apportion such issuance to other managers in his sole discretion.

6. In the event the Reorganized Debtor pays Allowed Claimants in Classes 1B and 3 within 12 months of the Effective Date, an additional 20 percent (20%) of the Stock will be issued to the CEO and all allocations will be diluted accordingly.

7.     The Articles of Incorporation and By-laws for the Reorganized Debtor will be executed and Stock will be issued in the following percentages:

- 75.0 percent (75%) to the Creditor Trust--to be held for the benefit of Class 1 Administrative Creditors (15%), Class 3 General Unsecured Creditors (30%) and Class 5 Insiders (30%)

- 20.0 percent (20%) to the CEO and other managers as selected solely by the CEO

- 5.0 percent (5%) to Class 3 Bank SNB

## 8.2.     Continued Corporate Existence

After the Effective Date, the Reorganized Debtor may operate its business and use, acquire, and dispose of property without the supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. After the Effective Date, it may hire and pay professionals and consultants without Court approval.

## 8.3.     Management

On the Effective Date, Mr. Delaresco will be appointed as Chief Executive Officer and Patrick Clune will be appointed as Chief Financial Officer.  They will serve in accordance with applicable corporate documents of the Reorganized Debtor.   As described above, Mr. Delaresco has been operating FHA without an employment contract and has received compensation at a significantly below market rate.  Yet, his efforts have increased EBITDA for the company substantially. As an incentive to retain the expertise of Mr. Delaresco and thereby enhance feasibility, noting that Mr. Delaresco has received other lucrative job offers, he will receive on the Effective Date 20 percent (20%) of the Stock in the Reorganized Debtor.  He may allocate a portion of these shares to other managers in his sole discretion.

In the event the Reorganized Debtor pays Allowed Claimants in Classes 1B and 3 within 12 months of the Effective Date, an additional 20 percent (20%) of the Stock will be

issued to Mr. Delaresco and all allocations will be diluted accordingly. The Reorganized Debtor and Mr. Delaresco will enter into a five-year market terms contract with normal benefits. This agreement will be included in the Plan Supplement. The Reorganized Debtor will obtain a key-man life insurance policy adequate to cover Classes 1 and 3 for a period of 18 months.

**8.4.** **Retention of Provider Numbers**

As of and after the Effective Date, the Hospital, under the ownership of the Reorganized Debtor, shall continue to be qualified for participation in the Medicare program, holding the same Medicare provider contract as the Hospital does currently, under the same terms and conditions and with all of the applicable payment statuses and attributes thereof.

**8.5.** **Creation of Creditor Trust and Appointment of Trustee**

On the Effective Date, a Creditor Trust will be created pursuant to the Creditor Trust Agreement (to be filed in the Plan Supplement) and it will hold the equity interests designated for creditors and facilitate certain creditor distributions required by the Plan. The Initial Creditor Trust Trustee ("Plan Trustee") will be David Gonzales who has served as the Debtor's financial advisor. Mr. Gonzales will be deemed appointed on the Effective Date, without further motion, application, notice, hearing or other order of the Court. Mr. Gonzales will be compensated as set forth in the Creditor Trust Agreement.

As more fully described in the Creditor Trust Agreement, the Plan Trustee shall hold the 75 percent (75%) percent of the shares of the Reorganized Debtor for the benefit of Classes 1, 3 and 5. No shares will be issued to individual creditors until such time as the creditor's Claim is allowed and until such time as the time for the additional Stock distribution to Mr. Delaresco has passed and all reallocations have been made.

The Reorganized Debtor will remit to the Creditor Trust $2 million in cash and will further remit sufficient funds to the Creditor Trust to enable the Trustee to make quarterly payment to allowed claimants in Classes 1B and 3 and to fund the operations of the Creditor Trust. Payments to all other classes will be made by the Reorganized Debtor.

The Creditor Trust may employ, without order of the Court, such counsel, advisors and other professionals selected by the Plan Trustee that are reasonably required to perform the Plan Trustee's responsibilities under the Plan. The Creditor Trust's professionals shall be compensated as agreed to by the Plan Trustee, without further motion, application notice, or other order of the Court. The fees and expenses of the Creditor Trust's professionals shall be paid by the Reorganized Debtor.

**8.6.** **Plan Projections**

The Reorganized Debtor will operate the Hospital with independent management and complete separation from Gilbert Hospital in all capacities including IT and any administrative functions. Plan projections will be provided in the Plan Supplement. The following is noted however. Through the reorganization efforts of current management, EBITDA for fiscal year end 2014 equaled $2,959,000 and for the first quarter of 2015, equaled $965,000. EBITDA of $4-6 million is projected over the term of the contemplated plan payments. If EBITDA remains in the already achieved $4 million range, this will cover contemplated Plan payments by a factor of 1.5. EBITDA does not need to increase from the current level to make contemplated payments, and for clarity, it could in fact drop by 50 percent (50%) and still support payments. The projections will support and demonstrate that all Plan payments can be made in accordance with the provisions of the Plan.

**8.7.   Effectuating Documents; Further Transactions**

Upon Confirmation, the Debtor and the Reorganized Debtor are authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**8.8.   Exemption from Transfer Taxes**

Pursuant to Section 1146(a) of the Bankruptcy Code, the creation or transfer of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, and executed in connection with the liquidation of assets shall not be subject to any stamp tax, real estate tax or similar tax.

**8.9.   Exemption from Securities Laws**

The issuance of the Reorganized Debtor Interests, and all other instruments, certificates, and other documents required to be issued or distributed pursuant to the Plan, (a) shall be authorized under Bankruptcy Code § 1145 as of the Effective Date without further act of action, and (b) shall be exempt pursuant to Bankruptcy Code § 1145 from registration under the Securities Act of 1933, as amended (and all rules and regulations promulgated thereunder), and under any state or local law (and all rules and regulations promulgated thereunder) requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security.

### ARTICLE IX
### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Subject to the approval of the Bankruptcy Court, the Debtor has the power to assume or reject an unexpired lease or a contract that is deemed executory by the fact that performance is due by both parties to the contract. That is to say, the lease or contract can be accepted as written and the parties continue as if the bankruptcy never occurred. In such

case the Debtor must cure any arrearages ("**Cure**") and give the counter party adequate assurance of performance. Conversely, the lease or contract can be rejected, in which case the Debtor is deemed to be in breach of the agreement, and practically speaking, the parties' obligations cease. The counter party may have a claim for damages as a consequence of the rejection.

In this case, the Debtor will assume as of the Effective Date the contracts and unexpired leases identified in the Plan Supplement (the "**Assumed Contracts**"). The Cure associated with each Assumed Contract will be identified and all other executory contracts and leases not listed shall be deemed rejected on Effective Date (the "**Rejected Contract**s") unless earlier rejected by Bankruptcy Court order. The Committee reserves the right to amend the list at any time prior to the Effective Date (a) to delete any executory contract or unexpired lease and provide for its rejection, or (b) to add any executory contract or unexpired lease and provide for its assumption under the Plan. Counter parties to those agreements will receive notice and each shall have fourteen days (14) from the date of the notice to file with the Bankruptcy Court a written objection to its treatment and its Cure if applicable. Failure to timely object will be deemed consent to the treatment and Cure. If a timely written objection is filed, a hearing for the resolution of the counter party's objection will be requested.

Unless it has done so previously, each counter party to a rejected lease or contract shall file on or before fourteen days after the Effective Date a proof of claim for any rejection damages. Failure to timely file such proof of claim will result in the establishment of the claim at zero dollars (-0-). The Plan Trustee reserves all rights to object to any proofs of claim.

## ARTICLE X
## CLAIMS, DISTRIBUTIONS, AND CLAIMS OBJECTIONS

**10.1.  Deadline for Applications for Administrative Expenses**

Applications for Administrative Claims shall be filed no later than 30 days after the Effective Date.  If Administrative Claims are not timely filed in accordance with the Plan, they will be forever barred and may not be asserted in any manner; provided, however, that no request for payment shall be required with respect to Administrative Claims that have been paid previously or with respect to Administrative Claims for expenses incurred in the ordinary course of business, unless a dispute exists as to those expenses, or unless the provisions of the Bankruptcy Code require approval or allowance by the Bankruptcy Court as a precondition to payments being made on that expense.

**10.2.  Filing of Objections**

The Plan Trustee shall have the exclusive right to file objections to Claims and the exclusive right to settle or withdraw those objections with respect to any claims totaling $100,000 or less. With respect to claims of larger amounts, the Plan Trustee shall seek approval of the Court upon notice to those creditors or parties entering a notice of appearance in the case. The holder of a Claim to which an objection has been filed will be required to file with the Bankruptcy Court a response setting forth its Claim with specificity. The Plan Trustee will request a hearing on any timely filed responses.  Claims objections must be filed within ninety (90) days after the Effective Date.

**10.3.  Plan Distributions**

Distributions to Creditors will be made in accordance with the Plan and the Creditor Trust Agreement.  No distributions will be made to any claimant unless that claimant has an Allowed Claim or Allowed Interest.

-45-

**10.4.** <u>**Amendment of Claims**</u>

A Claim may be amended prior to the Effective Date only as agreed upon by the Plan Trustee and the holder of the Claim or as otherwise permitted by the Bankruptcy Court and Bankruptcy Rules. After the Effective Date, a Claim may be amended to decrease, but not to increase, the amount thereof.

**10.5.** <u>**Full and Final Satisfaction**</u>

All payments and distributions under the Plan shall be in full and final satisfaction, settlement, release, and discharge of all Claims and Interests.

**ARTICLE XI**
**RETENTION OF JURISDICTION**

A. On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, to the fullest extent permissible under law, over all matters arising out of and related to the Chapter 11 Case for, among other things, the following purposes:

B. To hear and determine all matters with respect to the assumption or rejection of executory contracts or unexpired leases and the allowance of Cure amounts and Claims resulting therefrom;

C. To hear and determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date;

D. To hear and determine all matters with respect to the allowance, disallowance, liquidation, classification, priority or estimation of any Claim;

E. To ensure that distributions to holders of Allowed Claims or Allowed Interests are accomplished as provided in the Plan;

F. To hear and determine all applications for compensation and reimbursement of Professional Fee Claims;

-46-

G.      To hear and determine any application to modify the Plan in accordance with Section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, this Disclosure Statement or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

H.      To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated by the Plan or any agreement, instrument or other document governing or relating to any of the foregoing;

I.      To issue injunctions, enter and implement other orders and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

J.      To issue orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan;

K.      To enter, implement, or enforce orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

L.      To hear and determine matters concerning state, local and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of tax under Section 505(b) of the Bankruptcy Code);

M.      To hear and determine any other matters related to the Plan and not inconsistent with the Bankruptcy Code;

N.      To determine any other matters that may arise in connection with or are related to the Plan, this Disclosure Statement, the Confirmation Order, any of the

documents or any other contract, instrument, release or other agreement or document related to the Plan or this Disclosure Statement.

O.     To recover all Property of the Debtor's Estate, wherever located and whether vesting in the Reorganized Debtor or the Plan Trust pursuant to the Plan;

P.     To hear and determine all disputes involving the existence, nature or scope of the Debtor's discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

Q.     To hear and determine any rights, Claims or Causes of Action held by or accruing to the Debtor or the Reorganized Debtor pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

R.     To enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Debtor's Chapter 11 Case with respect to any Person;

S.     To hear and determine any disputes arising in connection with the interpretation, implementation or enforcement of any post-petition agreements;

T.     To hear any other matter not inconsistent with the Bankruptcy Code; and

U.     To enter a final decree closing the Chapter 11 Case.

## ARTICLE XII
## CONFIRMATION OF PLAN

Once the Disclosure Statement is approved and any required ballots are sent to any holders of Allowed Interests that may be entitled to vote on the Plan, the Bankruptcy Court will hold a Confirmation Hearing to determine whether the Plan may be confirmed. Any party in interest may object to Confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for_____ Phoenix time before the Honorable Brenda Moody Whinery, United States Bankruptcy Judge, in the

-48-

United States Bankruptcy Court for the District of Arizona, located at 230 N. First Ave, Phoenix, AZ 85003. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjourned hearing.

## 12.1. <u>Overview of Confirmation Standards</u>

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan meets the requirements of Section 1129 of the Bankruptcy Code. The Committee believes the Plan meets these requirements because:

The Plan complies with the applicable provisions of the Bankruptcy Code;

The Committee has complied with the applicable provisions of the Bankruptcy Code;

The Plan has been proposed in good faith and not by any means forbidden by law;

Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, this Chapter 11 Case, or in connection with the Plan and incident to this Chapter 11 Case, has been approved by, or is subject to the approval of the Bankruptcy Court;

The Committee has or will disclose the identity and affiliations of any individuals proposed to serve, after confirmation of the Plan, as a director or officer along with his or her compensation; that the appointment to, or continuance in, such office of such individual is consistent with the interests of Creditors and equity holders and with public policy;

With respect to each Class of Impaired Claims or Interests, each holder of a Claim or Interest in that Class has accepted the Plan or will receive as of the Effective Date an amount that is not less than the holder would receive or retain if the Debtor was liquidated on that date under Chapter 7 of the Bankruptcy Code. (See the "Best Interests Test");

Each Class of Claims or Interests has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of that Class;

Except to the extent that the holder of a particular Claim has agreed or will agree to a different treatment of his or her Claim, the Plan provides that allowed Administrative Claims and Priority Claims will be paid in full on the Effective Date or within 30 days or as soon as reasonably practical and that Priority Tax Claims will be either paid in full on the Effective Date or will receive deferred Cash payments, over a period not exceeding six years after the date of assessment of those Claims, of a value, as of the Effective Date, equal to the allowed amount of those Claims;

If a Class of Claims is Impaired under the Plan, at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class;

Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization.

## 12.2. <u>Acceptance of the Plan</u>

The Bankruptcy Code generally requires that each Impaired Class accept the Plan. A Class of Claims or Interests that is Unimpaired under the Plan is deemed to have accepted the Plan and, therefore, solicitation of acceptances from unimpaired Classes is not required.

A Class is Impaired unless the plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the Claim or equity interest entitles the holder of the Claim or equity interest; (b) cures any default and reinstates the original terms of the obligation; or (c) provides that, on the consummation date, the holder of the Claim or equity interest receives Cash equal to the allowed amount of that Claim, or with respect to any equity interest, any fixed liquidation preference to which the holder of the equity interest is entitled to any fixed price at which the Debtor may redeem the security.

Case 4:13-bk-03201-BMW    Doc 859    Filed 05/18/15    Entered 05/18/15 17:51:09    Desc
Main Document    Page 50 of 99

In this Chapter 11 Case, all Classes except Class 2 are impaired and their vote will be solicited for their acceptance or rejection of the Plan.

**12.3.** **Objections to Confirmation**

Any objection to the Plan must:

- Be made in writing;

- Conform to the Bankruptcy Rules and the Local Rules;

- Set forth the name of the objector; the nature and amount of the Claims or Interests the objector holds against the Debtor; and the specific basis for the objection;

- Be electronically filed with the Bankruptcy Court; and

- Be served upon the following parties:

Carolyn J. Johnsen
Dickinson Wright
1850 N. Central Avenue, Suite 1400
Phoenix, Arizona 85004

All objections to the Plan must be actually received no later than _____. All objections to the Plan are governed by Bankruptcy Rule 9014. **THE BANKRUPTCY COURT WILL NOT CONSIDER A PLAN OBJECTION UNLESS IT IS TIMELY FILED AND SERVED IN COMPLIANCE WITH THIS DISCLOSURE STATEMENT.**

**ARTICLE XIII**
**EFFECT OF CONFIRMATION**

**13.1.** **Vesting of Assets**

Upon the Effective Date, pursuant to Sections 1141(b) and (c) of the Bankruptcy Code, all Property of the Debtor and of the Estate, (including the Debtor's and the hospital's right and privileges), except for the Effective Date cash payment to the Creditor Trust and Causes of Action which shall vest in the Creditor Trust, shall vest in the

-51-

Reorganized Debtor, free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as otherwise expressly provided in the Plan. All Liens, Claims, encumbrances, charges, and other interests shall be deemed fully released and discharged as of the Effective Date, except as otherwise provided in the Plan. As of the Effective Date, the Reorganized Debtor may operate the business and may use, acquire, and dispose of Property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there was no pending cases under any chapter or provision of the Bankruptcy Code.

Upon the Effective Date, the Effective Date cash and Causes of Action shall vest in the Creditor Trust in accordance with the Plan and Creditor Trust Agreement free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as otherwise expressly provided in the Plan and the Creditor Trust Agreement. All Liens, Claims, encumbrances, charges, and other interests shall be deemed fully released and discharged as of the Effective Date except as otherwise provided in the Plan and the Plan Trust Agreement.

**13.2.** **Preservation of Causes of Action**

   **A.** **Claims against Gilbert Hospital**

   **(1)** **Preference Payments**

On April 30, 2012 and June 6, 2012, respectively, FHA made transfers of $1,000,000 and $1,216,748.14 to GH (the "Preference Payments"). The Preference Payments were made on account of a prior loan extended by GH to FHA. The Committee believes that it was insolvent at the time the Preference Payments were made, and that the Preference Payments allowed the Debtor to receive more than it would have received had the Preference Payments not been made, and FHA were liquidated under Chapter 7 of the United States Bankruptcy Code. The Preference Payments were made to the Debtor within

the one year preceding the filing of FHA's bankruptcy petition, and, given the extent of their interrelationships, GH was, and is, an "insider" of FHA, as that term is defined in 11 U. S.C. § 101(31). As such, the Committee believes that the Preference Payments to GH constitute avoidable preferences under 11 U.S.C. § 547, that GH is therefore indebted to FHA in the amount of $2,216,748.14, and that GH is not entitled to the allowance or payment of any claim in its favor in FHA's bankruptcy proceedings unless and until the amount of the Preference Payments are paid over to FHA. The Committee does not believe GH has any defenses to this claim.

### (2)      Misappropriated Funds

In the course of their prior dealings, payments from patients and insurance companies attributable to goods and services provided by FHA would be delivered to GH, and then directed to FHA's accounts. FHA has reviewed its records and determined that at least $46,593.44 in payments which should have been directed to FHA's accounts, were improperly deposited in GH's accounts. GH has ignored all demands for the return of the funds. These payments are the property of FHA and have been improperly converted by the GH. GH holds these funds, and any similarly misappropriated funds, in trust for FHA's benefit, and the Committee/Plan Trustee reserves the right to take any action necessary to compel the transfer of these funds to FHA. The Committee believes GH disputes these allegations.

### (3)      Claims Regarding Administrative Expenses

As outlined above the administrative services provided by GH to FHA were substandard and mischarged and misallocated all of which caused damage to FHA.

### B.      Claims against other parties

The following Causes of Action are specifically preserved:

(1)  Those Causes of Action asserted in Adversary Case Number 4-15-ap-00164 against multiple defendants to avoid and recover fraudulent transfers in connection with the Defendants' respective redemption, or purported redemption, of their membership interests in the Debtor.

(2)  Those Causes of Action asserted in Adversary 4-13-ap-00765 against Bank SNB to avoid and recover prepetition transfers.  (The Committee notes that the matter has been settled but the settlement has not been approved by the Court).

(3)  Those Causes of Action which may exist against Dr. Johns, Peoria Regional Medical Center, LLC ("Peoria"); Buckeye Regional Medical Center, LLC ("Buckeye"); Visionary Health, LLC ("Visionary"); and FHAD Property, LLC ("FHAD") and their respective officers and directors to avoid and recover prepetition transfers all as outlined in Article III of this Disclosure Statement.

(4)  Former management of FHA and the management and officers and directors of Gilbert Hospital related to the mismanagement of FHA all as outlined in Article III of this Disclosure Statement.

Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtor, the Reorganized Debtor, or the Plan Trust may have or choose to assert under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, and including without limitation any crossclaim, counterclaim, and/or claim for setoff that seeks affirmative relief against the Debtor, the Reorganized Debtor, the Plan Trust or its officers, directors or representatives. All Causes of Action shall vest on the Effective Date in the Creditor Trust.

### 13.3.  <u>Exculpation and Release</u>

Pursuant to the Plan, the Debtor, the Committee, the Reorganized Debtor, and the PCO and all of their  respective present and former partners, members, officers, directors,

-54-

employees, advisors, attorneys and agents (collectively, the "Released Parties") shall not have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or Affiliates, or any of their successors or assigns for any act or omission in connection with, relating to or arising out of this Chapter 11 Case, any settlement related to this Chapter 11 Case, the negotiation and execution of a proposed Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Estate or of the Plan, issuance and distribution of any securities issued or to be issued pursuant to the Plan, or the Property to be distributed under the Plan, except only to the extent that liability is based on willful misconduct. The Released Parties shall be entitled to reasonably rely on the advice of counsel with respect to their duties and responsibilities under the Plan, or in the context of the Chapter 11 Case.

No other releases of third parties are intended by this Plan.

**13.4. <u>Discharge and Injunction</u>**

Except as otherwise specifically provided in the Plan or in the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made under the Plan shall discharge all existing debts and Claims, and shall terminate all interests of any kind, nature, or description whatsoever against or in the Reorganized Debtor or Creditor Trust or any of their assets or properties to the fullest extent permitted by Section 1141 of the Bankruptcy Code. Except as otherwise specifically provided in the Plan or in the Confirmation Order, upon the Effective Date, all existing Claims against the Debtor and interests in the Debtor shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Interests (and all representatives, trustees, or agents on behalf of each holder) shall be precluded and enjoined from asserting against the Debtor, the Reorganized Debtor, the Creditor Trust, the Plan Trustee, their respective successors or

-55-

assignees, or any of their assets or properties, any other or further Claim or Interest based on any act or omission, transaction, or other activity of any kind or nature that occurred before the Effective Date, whether or not the holder has filed a Proof of Claim and whether or not the facts or legal bases therefor were known or existed before the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims against, liabilities of, and Interests in the Debtor, subject to the occurrence of the Effective Date.

Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise provided in the Plan, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any Affiliate of the holder shall be deemed to have forever waived, released, and discharged the Debtor and the Reorganized Debtor, to the fullest extent permitted by Section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose before the Effective Date. Upon the Effective Date, all those Persons shall be forever precluded and enjoined, pursuant to Section 524 of the Bankruptcy Code, from prosecuting or asserting any discharged Claim against or terminated Interest in the Debtor.

Except as otherwise expressly provided in the Plan, all persons or entities who have held, hold, or may hold Claims or Interests and all other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, representatives, and Affiliates, are permanently enjoined, from and after the Effective Date, from: (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Interest; (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtor, the Reorganized Debtor, the Creditor Trust or Plan Trustee or property of the Debtor; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind

against the Debtor, the Reorganized Debtor, the Creditor Trust or Trustee, or against the property or interests in property of the Debtor; or (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtor the Reorganized Debtor, the Creditor Trust or Plan Trustee, or against the Property or interests in property of the Debtor, with respect to any such Claim or Interest. This injunction shall extend to any successors or assignees of the Debtor, Debtor, the Reorganized Debtor, the Creditor Trust or Plan Trustee, and their respective properties and interests in properties.

**13.5.** <u>**Dissolution of Committee.**</u>

On the Effective Date, the Committee shall dissolve and its members shall be released of their respective duties, responsibilities and obligations in connection with the Chapter 11 Case or the Plan.

**13.6.** <u>**Discharge of Patient Care Ombudsman.**</u>

On the Effective Date, (a) the PCO shall be released and discharged of all his duties, responsibilities and obligations in connection with the Chapter 11 Case or the Plan; and (b) the retention or employment of the PCO's professionals and agents shall be terminated, other than with respect to filing the PCO's final fee application.

**13.7.** <u>**Corporate Authority.**</u>

The Confirmation Order shall constitute full and complete corporate authority for the Debtor, the Reorganized Debtor, and the Plan Trustee to take all other actions that may be necessary, useful or appropriate to consummate the Plan without any further corporate or judicial authority.

**13.8.** <u>**Setoff and Recoupment**</u>

The Creditor Trust may, but shall not be required to, set off or recoup against any Claim and any distribution to be made on account of that Claim, any and all claims, rights, and Causes of Action of any nature that the Creditor Trust may have against the holder of

that Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; provided, however, that neither the failure to effect a set off or recoupment nor the allowance of any Claim under the Plan shall constitute a waiver, abandonment, or release by the Creditor Trust of any of those claims, rights, and Causes of Action that the Creditor Trust may have against the holder of the Claim. To the extent the Creditor Trust fails to setoff or recoup against a holder and seek to collect a claim from that holder after a distribution to the holder pursuant to the Plan, the Creditor Trust shall be entitled to full recovery on its claim against that holder of a Claim.

**13.9. <u>Liquidation Analysis and Best Interest of Creditors Test</u>**

One of the factors the Bankruptcy Court must consider before confirming a proposed plan of reorganization is whether the Plan is in the "best interests" of all Classes of Impaired Claims and equity Interests. The Bankruptcy Court will find the "best interests" test satisfied if either the holder of a Claim or Interest in a Class accepts the Plan or the Plan will provide a holder that has not accepted the Plan with a recovery of at least equal in value to the recovery the holder would receive if the Debtor were liquated under Chapter 7 of the Bankruptcy Code. In this case, creditors will be paid in full and thus, the test has been satisfied.

**ARTICLE XIV**
**FEASIBILITY**

The Bankruptcy Code requires that to confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by a further liquidation or need for further financial reorganization of the Debtor (the "**<u>Feasibility Test</u>**"). For the Plan to meet the Feasibility Test, the Bankruptcy Court must find that the Reorganized Debtor will possess the resources and working capital necessary to meet its obligations under the Plan. The Debtor believes that the structure set forth in the Plan is a feasible framework for the recovery for Creditors.

-58-

## ARTICLE XV
## ALTERNATIVES AND RISK FACTORS

There are certain risks factors to take into consideration. One risk is that the Bankruptcy Court will conclude that the Committee has not satisfied the Bankruptcy Code requirements for Confirmation as described above. Another risk is that the Gilbert Hospital Court and this Court will confirm the Joint Plan filed in the respective cases. The Joint Plans however require that the plans must be confirmed by both Courts in order to be effective. It must be noted, that neither Court has approved how this highly unusual situation will proceed procedurally with two sets of creditors, two sets of operations and two Courts.

This Committee Plan will be in competition with the Joint Plan. The Committee believes the Committee Plan is far superior. For example, unsecured creditors in Florence are paid over 18 months (and possibly in one year) with interest and they receive stock in the Reorganized Debtor. This compares with the four-year pay-out in the Joint Plan. The

Committee questions the viability of the projections of the GH revenues to make Plan payments. For example, GH does not take into consideration the fact that two Dignity Health facilities have or are opening within in a six mile radius of Gilbert Hospital. This will undoubtedly have a serious impact on projected income and the ability to pay creditors.

Based on the foregoing, the Committee believes the Committee Plan as proposed provides the best alternative for creditors.

## ARTICLE XVI
## TAX CONSEQUENCES

The tax consequences of the Plan will be included in the Plan Supplement.

# ARTICLE XVII
## MISCELLANEOUS PROVISIONS

### 17.1.  Binding Effect of Plan

The provisions of this Plan shall bind the Debtor, Creditors, and Interest Holders, and shall bind any Person asserting a Claim against the Debtor or an Interest in the Debtor, whether or not the Claim or Interest arose before or after the Petition Date or the Effective Date, whether or not the Claim or Interest is impaired, and whether or not the Person has accepted the Plan.

### 17.2.  Appeals

In the event of an appeal of the Confirmation Order or any other kind of review or challenge to the Confirmation Order, and provided that no stay of the effectiveness of the Confirmation Order has been entered, the Bankruptcy Court will retain jurisdiction to implement and enforce the Confirmation Order and the Plan according to their terms, including, but not limited to, jurisdiction to enter such orders regarding the Plan or the performance thereof to implement the Plan.

### 17.3.  Modification and Amendment of Exhibits, Schedules, and Appendices

The Committee may modify or amend the terms of any document or agreement that is an Exhibit, schedule or appendix to the Plan without the need for re-solicitation of votes with respect to the Plan; provided, however, that the modification or amendment does not materially adversely affect the rights of any Person provided in the Plan, and provided further however, that prior notice of the modification or amendment shall be served in accordance with the Bankruptcy rules or any order of the Bankruptcy Court.

### 17.4.  Governing Law

Except to the extent the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by and construed and enforced in accordance with the laws of the State of Arizona.

-60-

### 17.5. Headings

The headings of the Articles, Sections and Subsections of the Plan are inserted for convenience only and shall not limit the interpretation of the Plan.

### 17.6. Amendment and Modification of the Plan

The Committee may propose amendments to or modifications of the Plan at any time prior to confirmation of the Plan without the leave of the Bankruptcy Court or as permitted by the Bankruptcy Code or Bankruptcy Rules. After confirmation of the Plan, the Reorganized Debtor may amend or modify the Plan, with the approval of the Bankruptcy Court, so long as it does not materially or adversely affect the interests of Creditors or other parties in interest as set forth herein, to remedy any defect or omission or to reconcile any inconsistencies in the Plan or in the Confirmation Order, in a manner as may be necessary to carry out the purposes and intent of the Plan.

### 17.7. Withdrawal of Plan

The Plan may be withdrawn or revoked prior to the entry of the Confirmation Order at the sole discretion of the Committee.

### 17.8. Effect of Confirmation Order

The Confirmation Order will include a provision that the Confirmation Order shall be immediately effective and enforceable upon its entry and shall not be subject to any stay under Bankruptcy Rule 3020(e) or otherwise.

### 17.9. Quarterly Fees

The quarterly fees required by 28 U.S.C. § 1930(a)(6) will be paid by the Reorganized Debtor and reports will be filed with, the Office of the United States Trustee by the Reorganized Debtor until application is made for entry of a final decree. Application for a final decree can be made when the Plan has been fully administered,

-61-

which for purposes of the Plan shall mean when the Plan has been substantially consummated, as that term is defined in § 1101(2) of the Bankruptcy Code.

## CONCLUSION

THE COMMITTEE STRONGLY URGES SUPPORT FOR THE PLAN OF REORGANIZATION.

DATED: May 18, 2015.

OFFICIAL COMMITTEE OF UNSECURED CREDITORS

By: /s/ Carolyn J. Johnsen

PHOENIX 99999-100 219544v1

# EXHIBIT A

courtdocs@dickinsonwright.com
**Carolyn J. Johnsen (#011894)**
**DICKINSON WRIGHT PLLC**
**1850 N. Central Ave., Ste. 1400**
**Phoenix, Arizona 85004**
**Phone: (602) 285-5000**
**Fax: (602) 285-5100**
cjjohnsen@dickinsonwright.com
*Attorneys for the Official Committee of Unsecured Creditors*

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re: | Chapter 11 Proceedings |
| FLORENCE HOSPITAL AT ANTHEM, LLC, | Case No. 4:13-bk-03201-BMW |
| Debtor. | |

# OFFICIAL COMMITTEE OF UNSECURED CREDITORS' CHAPTER 11 PLAN OF REORGANIZATION DATED MAY 18, 2015

**INTRODUCTION**

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") submits this Plan of Reorganization, as it may be amended from time to time (the "<u>Plan</u>"), to the Court and creditors of the Debtor's Estate, pursuant to Bankruptcy Code § 1121(a). The Committee is the "<u>Plan Proponent</u>" of the Plan within the meaning of Bankruptcy Code § 1129. Reference is made to the "Disclosure Statement in Support of Official Committee of Unsecured Creditors' Chapter 11 Plan of Reorganization" filed contemporaneously herewith (the "<u>Disclosure Statement</u>"), for a discussion of the Debtor's history, business, property, results of operations and projections for future operations, and for a summary and analysis of the Plan and related matters. All holders of Claims against and equity Interests in the Debtor are encouraged to read the Plan and the Disclosure Statement in their entirety before voting to accept or reject the Plan.

**DEFINITIONS**

**Defined Terms**. The terms used in this Plan have the same meaning as those defined in Exhibit B to the Disclosure Statement or in the Bankruptcy Code, Rules, or otherwise defined in the Disclosure Statement or Plan.

**Undefined Terms**. Terms and phrases, whether capitalized or not, that are used and not defined herein, but are defined by the Bankruptcy Code, have the meanings ascribed to them in the Bankruptcy Code. Terms and phrases, whether capitalized or not, not defined herein and not defined by the Bankruptcy Code, but which have been defined by motions and orders filed in this Chapter 11 case have the meaning ascribed to them in such motions and orders.

**Rules of Interpretation**. For purposes of this Plan: (a) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that it shall be substantially in such form or substantially on such terms and conditions; (b) any reference in the Plan to an existing

document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented; (c) unless otherwise specified, all references in the Plan to Sections, Articles, Appendices, Schedules, and Exhibits are to the Sections, Articles, Appendices, Schedules, and Exhibits of or to the Plan; (d) the words "herein" or "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (e) the headings and captions used in this Plan are for convenience and reference only and are not intended to be a part of or affect the interpretation of the Plan and shall not limit or otherwise affect the provisions hereof; (f) words denoting the singular number shall include the plural number and vice versa; (g) words denoting one gender shall include the other gender; and (h) the rules of construction set forth in Section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

**Computation of Time**. In computing any period of time prescribed by or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE I
## CLASSIFICATION OF CREDITORS

**1.1.** **Class 1—Allowed Administrative Expenses**

Allowed Administrative Claims will be paid as follows:

**1A** Ordinary course of business claims including those amounts owed to ordinary course professionals will be paid as their claims mature;

**1B** All other Allowed Administrative Claimants including professional fees will receive on the Effective Date or as allowed, their pro rata share of $2 million in cash. The remaining amounts owed to Allowed Administrative Creditors shall be paid in full plus 1.5 percent (l.5%) interest in quarterly installments over a period of 18 months commencing on the first day of the second quarter after the Effective Date. In addition, Allowed Administrative Creditors will be allocated 15 percent (15%) of the Series A common stock ("**Stock**") in the Reorganized Debtor to be distributed pro rata as per their Allowed Claims.

Allowed Administrative Creditors in Class 1B may elect to receive Stock instead of any cash distributions based on an $8 million valuation. The cash distribution will be adjusted accordingly. In the event the Reorganized Debtor pays Allowed Claimants in Class 1B and Class 3 described below within 12 months of the Effective Date, an additional 20 percent (20%) of the Stock will be issued to the CEO, Arthur Doloresco and all allocations will be diluted accordingly.

Class 1 is impaired and entitled to vote on the Plan.

## 1.2. <u>Class 2 – Priority Tax Claims</u>

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment or treatment is ordered by the Bankruptcy Court, in full and final satisfaction, each holder shall be treated in accordance with the terms set forth in Bankruptcy Code section 1129(a)(9)(C). The Debtor believes Priority Tax Claims may consist of personal property taxes of approximately $4,000. Class 2 is not impaired, will not be solicited, and is not entitled to vote on the Plan.

## 1.3. <u>Class (3) – General Unsecured Creditors</u>

Class 3 consists of the Allowed Unsecured Claims of general unsecured creditors not otherwise classified. Allowed Unsecured Creditors in this Class will be paid in full plus 6.0 percent (6%) interest in quarterly installments over a period of 18 months commencing on the first day of the second quarter after the Effective Date. In addition, Allowed Unsecured Creditors will be allocated 30 percent (30%) of the Series A common stock ("**Stock**") in the Reorganized Debtor to be distributed pro rate as per their Allowed Claims. Allowed Claimants in this Class may elect to receive Stock instead of any cash distributions based on an $8 million valuation. The cash distribution will be adjusted accordingly. In the event the Reorganized Debtor pays Allowed Claimants in this Class and Class 1B (described above)

-4-

within 12 months of the Effective Date, an additional 20 percent (20%) of the Stock will be issued to the CEO, Arthur Doloresco and all allocations will be diluted accordingly.

Class 3 is impaired and entitled to vote on the Plan.

### 1.4. Class 4 – Bank SNB

Class 4 consists of the Allowed Secured Claim of Bank SNB which claim is believed to be $9,800,000. Bank SNB's debt will be amortized over 15 years at an interest rate of 6 percent (6%) per annum. Principal and interest payments will be made monthly commencing on the first day of the second month after the Effective Bank SNB will retain its lien on all assets of the Reorganized Debtor. The Letter of Credit will remain in place. The GH Guarantee will remain in place. In addition to the above, on the Effective Date, Class 4 will receive 5 percent (5%) of the Stock in the Reorganized Debtor. Any defaults will be strictly payment defaults which may be cured with 15-day notice. Other terms will be generally consistent with the current loan documents. Class 4 is impaired and entitled to vote on the Plan.

### 1.5. Class 5 – Allowed Unsecured Claims of Insiders

Class 5 consists of the Allowed Unsecured Claim, if any, of Insiders including Gilbert Hospital, the Indemnity Claims and Dr. Johns. Allowed Creditors in this Class will receive a pro rata share of 30 percent (30%) of the Stock. This Class is impaired and entitled to vote on the Plan.

### 1.6. Class (6) – Covidien

Class (6) consists of the Allowed Secured Claim of Covidien, in the approximate amount of $4,324, secured by a lien on certain equipment used by FHA in connection with its operations. Covidien will retain its lien and will receive $400.00 on the Effective date, which amount will be applied to the principal balance of Covidien's Allowed Secured Claim. The remainder of the claim will paid in full in equal quarterly installments of principal and

interest, accruing at the rate of 6% per annum, over three (3) years, commencing on the first day of the second month after the Effective Date. Reorganized FHA will have the right, in its sole and absolute discretion, to pre-pay the full amount of Covidien's Allowed Secured Claim at any time without penalty. This Class is impaired and entitled to vote on the Plan.

### 1.7. Class (7) – Dr. Johns

Class 7 consists of the allowed secured claim of Dr. Johns. The Committee believes that senior lien(s) fully encumber the assets that secure the Claim of Dr. Johns As such, the junior lien of Dr. Johns has no value. Therefore, Dr. Johns' Claim against FHA shall be allowed in the amount of $100,000 and shall be treated in Class 5. This Class is impaired and is entitled to vote on the Plan.

### 1.8. Class 8 – Allowed Unsecured Claim of Glaser

Class 8 consists of the Allowed Unsecured Claim of Glaser. The Debtor has turned over the defense and payment of Glaser's claim against the Debtor to the Debtor's insurance company and has allowed, or will allow, Glaser to pursue recovery of his claims against the insurance company. To the extent the Debtor is found liable with respect to Glaser's clams against the Debtor, the Debtor will pay the deductible payable by the Debtor under its insurance policy to Glaser in full and final satisfaction of any and all claims that Glaser has or may have against the Debtor. This Class is impaired and entitled to vote on the Plan.

### 1.9. Class 9 – Equity Interests

Class 9 consists of the equity Interests in the Debtor. These Interests will be cancelled on the Effective Date.

### ARTICLE II
### MEANS FOR IMPLEMENTATION OF THE PLAN

### 2.1. Overview of the Implementation of the Plan

The Debtor will emerge as a C Corporation. Its sole director will be the Creditor Trust described below. The Trustee of the Creditor Trust will serve as the Chairman and Secretary

-6-

of the Board. The Articles of Incorporation and By-laws will be provided in a "**Plan Supplement**" to be filed 10 days prior to the first hearing on the Committee's Disclosure Statement.

**On the Effective Date**:

1.    The Reorganized Debtor will create the Creditor Trust and will transfer to it $2 million in cash  or such adjusted amount depending on a creditor's election of equity and all Causes of Action including Avoidance Actions.

2.    The cash will be utilized to pay pro rata Allowed Administrative Creditors on the Effective Date or as allowed, with sufficient reserve to pay disputed claims. The remaining amounts owed to Allowed Administrative Creditors shall be paid in full plus 1.5 percent (l.5%) interest in quarterly installments over a period of 18 months commencing on the first day of the second quarter after the Effective Date.   In addition, Allowed Administrative Creditors in Class 1B will be allocated 15 percent (15%) of the Series A common stock ("**Stock**") in the Reorganized Debtor.

3.    Allowed Unsecured Creditors will be paid in full plus 6.0 percent (6%) interest in quarterly installments over a period of 18 months commencing on the first day of the second quarter after the Effective Date.   In addition, Allowed Unsecured Creditors will be allocated 30 percent (30%) of the Series A common stock ("**Stock**") in the Reorganized Debtor.

4.    Allowed Claimants in Classes 1B and 3 may elect to receive Stock instead of any cash distributions based on an $8 million valuation. The cash distribution will be adjusted accordingly.

5.    Twenty percent (20%) of the Stock will be issue to the CEO Mr. Delaresco and he may apportion such issuance to other managers in his sole discretion.

6.      In the event the Reorganized Debtor pays Allowed Claimants in Classes 1 and 3 within 12 months of the Effective Date, an additional 20 percent (20%) of the Stock will be issued to the CEO and all allocations will be diluted accordingly.

7.      The Articles of Incorporation and By-laws for the Reorganized Debtor will be executed and Stock will be issued in the following percentages:

- 75.0 percent (75%) to the Creditor Trust-- to be held for the benefit of Class 1 Administrative Creditors (15%), Class 3 General Unsecured Creditors (30%) and Class 5 Insiders (30%).

- 20.0 percent (20%) to the CEO and other managers as selected solely by the CEO.

- 5.0 percent (5%) to Class 3 Bank SNB.

**2.2.    <u>Continued Corporate Existence</u>**

After the Effective Date, the Reorganized Debtor may operate its business and use, acquire, and dispose of property without the supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. After the Effective Date, it may hire and pay professionals and consultants without Court approval.

**2.3.    <u>Management</u>**

On the Effective Date, Mr. Delaresco will be appointed as Chief Executive Officer and Patrick Clune will be appointed as Chief Financial Officer.  They will serve in accordance with applicable corporate documents of the Reorganized Debtor.   As described above, Mr. Delaresco has been operating FHA without an employment contract and has received compensation at a significantly below market rate.  Yet, his efforts have increased EBITDA for the company substantially. As an incentive to retain the expertise of Mr. Delaresco and thereby enhance feasibility, noting that Mr. Delaresco has received other lucrative job offers, he will receive on the Effective Date 20 percent (20%) of the Stock in the Reorganized Debtor.  He may allocate a portion of these shares to other managers in his sole discretion.

-8-

In the event the Reorganized Debtor pays Allowed Claimants in Classes 1B and 3 within 12 months of the Effective Date, an additional 20 percent (20%) of the Stock will be issued to Mr. Delaresco and all allocations will be diluted accordingly. The Reorganized Debtor and Mr. Delaresco will enter into a five-year market terms contract with normal benefits. This agreement will be included in the Plan Supplement. The Reorganized Debtor will obtain a key-man life insurance policy adequate to cover Classes 1 and 3 for a period of 18 months.

## 2.4.     Retention of Provider Numbers

As of and after the Effective Date, the Hospital, under the ownership of the Reorganized Debtor, shall continue to be qualified for participation in the Medicare program, holding the same Medicare provider contract as the Hospital does currently, under the same terms and conditions and with all of the applicable payment statuses and attributes thereof.

## 2.5.     Creation of Creditor Trust and Appointment of Trustee

On the Effective Date, a Creditor Trust will be created pursuant to the Creditor Trust Agreement (to be filed in the Plan Supplement) and it will hold the equity interests designated for creditors and facilitate certain creditor distributions required by the Plan. The Initial Creditor Trust Trustee ("Plan Trustee") will be David Gonzales who has served as the Debtor's financial advisor. Mr. Gonzales will be deemed appointed on the Effective Date, without further motion, application, notice, hearing or other order of the Court. Mr. Gonzales will be compensated as set forth in the Creditor Trust Agreement.

As more fully described in the Creditor Trust Agreement, the Trustee shall hold the 75 percent (75%) percent of the shares of the Reorganized Debtor for the benefit of Classes 1B, 3 and 5. No shares will be issued to individual creditors until such time as the creditor's Claim is allowed and until such time as the time for the additional Stock distribution to Mr. Delaresco has passed and all reallocations have been made.

The Reorganized Debtor will remit to the Creditor Trust $2 million in cash and will further remit sufficient funds to the Creditor Trust to enable the Trustee to make quarterly payment to allowed claimants in Classes 1B and 3 and to fund the operations of the Creditor Trust. Payments to all other classes will be made by the Reorganized Debtor.

The Creditor Trust may employ, without order of the Court, such counsel, advisors and other professionals selected by the Plan Trustee that are reasonably required to perform the Plan Trustee's responsibilities under the Plan. The Creditor Trust's professionals shall be compensated as agreed to by the Plan Trustee, without further motion, application notice, or other order of the Court. The fees and expenses of the Creditor Trust's professionals shall be paid by the Reorganized Debtor.

## 2.6. Plan Projections

The Reorganized Debtor will operate the Hospital with independent management and complete separation from Gilbert Hospital in all capacities including IT and any administrative functions. Plan projections will be provided in the Plan Supplement. The following is noted however. Through the reorganization efforts of current management, EBITDA for fiscal year end 2014 equaled $2,959,000 and for the first quarter of 2015, equaled $965,000. EBITDA of $4-6 million over the term of the contemplated plan payments. If EBITDA remains in the already achieved $4 million range, this will cover contemplated Plan payments by a factor of 1.5. EBITDA does not need to increase from the current level to make contemplated payments and for clarity, it could in fact drop by 50 percent (50%) and still support payments. The projections will support and demonstrate that all Plan payments can be made in accordance with the provisions of the Plan.

## 2.7. Effectuating Documents; Further Transactions

Upon Confirmation, the Debtor and the Reorganized Debtor is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements

-10-

or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**2.8.** <u>**Exemption from Transfer Taxes**</u>

Pursuant to Section 1146(a) of the Bankruptcy Code, the creation or transfer of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, and executed in connection with the liquidation of assets shall not be subject to any stamp tax, real estate tax or similar tax.

**2.9.** <u>**Exemption from Securities Laws**</u>

The issuance of the Reorganized Debtor Interests, and all other instruments, certificates, and other documents required to be issued or distributed pursuant to the Plan, (a) shall be authorized under Bankruptcy Code § 1145 as of the Effective Date without further act of action, and (b) shall be exempt pursuant to Bankruptcy Code § 1145 from registration under the Securities Act of 1933, as amended (and all rules and regulations promulgated thereunder), and under any state or local law (and all rules and regulations promulgated thereunder) requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security.

**ARTICLE III**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Subject to the approval of the Bankruptcy Court, the Debtor has the power to assume or reject an unexpired lease or a contract that is deemed executory by the fact that performance is due by both parties to the contract. That is to say, the lease or contract can be accepted as written and the parties continue as if the bankruptcy never occurred. In such case the Debtor must cure any arrearages ("<u>**Cure**</u>") and give the counter party adequate assurance of performance. Conversely, the lease or contract can be rejected, in which case the Debtor is

-11-

deemed to be in breach of the agreement, and practically speaking, the parties' obligations cease. The counter party may have a claim for damages as a consequence of the rejection.

In this case, the Debtor will assume as of the Effective Date the contracts and unexpired leases identified in the Plan Supplement (the "**Assumed Contracts**"). The Cure associated with each Assumed Contract will be identified and all other executory contracts and leases not listed shall be deemed rejected on Effective Date (the "**Rejected Contract**s") unless earlier rejected by Bankruptcy Court order. The Committee reserves the right to amend the list at any time prior to the Effective Date (a) to delete any executory contract or unexpired lease and provide for its rejection, or (b) to add any executory contract or unexpired lease and provide for its assumption under the Plan. Counter parties to those agreements will receive notice and each shall have fourteen days (14) from the date of the notice to file with the Bankruptcy Court a written objection to its treatment and its Cure if applicable. Failure to timely object will be deemed consent to the treatment and Cure. If a timely written objection is filed, a hearing for the resolution of the counter party's objection will be requested. .

Unless it has done so previously, each counter party to a rejected lease or contract shall file on or before fourteen days after the Effective Date a proof of claim for any rejection damages. Failure to timely file such proof of claim will result in the establishment of the claim at zero dollars (-0-). The Plan Trustee reserves all rights to object to any proofs of claim.

**ARTICLE IV**
**CLAIMS, DISTRIBUTIONS, AND CLAIMS OBJECTIONS**

**4.1.** **Deadline for Applications for Administrative Expenses**

Applications for Administrative Claims shall be filed no later than 30 days after the Effective Date. If Administrative Claims are not timely filed in accordance with the Plan, they will be forever barred and may not be asserted in any manner; provided, however, that

-12-

no request for payment shall be required with respect to Administrative Claims that have been paid previously or with respect to Administrative Claims for expenses incurred in the ordinary course of business, unless a dispute exists as to those expenses, or unless the provisions of the Bankruptcy Code require approval or allowance by the Bankruptcy Court as a precondition to payments being made on that expense.

### 4.2. <u>Filing of Objections</u>

The Plan Trustee shall have the exclusive right to file objections to Claims and the exclusive right to settle or withdraw those objections with respect to any claims totaling $100,000 or less. With respect to claims of larger amounts, the Plan Trustee shall seek approval of the Court upon notice to those creditors or parties entering a notice of appearance in the case. The holder of a Claim to which an objection has been filed will be required to file with the Bankruptcy Court a response setting forth its Claim with specificity. The Plan Trustee will request a hearing on any timely filed responses. Claims objections must be filed within ninety (90) days after the Effective Date.

### 4.3. <u>Plan Distributions</u>

Distributions to Creditors will be made in accordance with the Plan and the Creditor Trust Agreement. No distributions will be made to any claimant unless that claimant has an Allowed Claim or Allowed Interest.

### 4.4. <u>Amendment of Claims</u>

A Claim may be amended prior to the Effective Date only as agreed upon by the Plan Trustee and the holder of the Claim or as otherwise permitted by the Bankruptcy Court and Bankruptcy Rules. After the Effective Date, a Claim may be amended to decrease, but not to increase, the amount thereof.

**4.5.** **Full and Final Satisfaction**

All payments and distributions under the Plan shall be in full and final satisfaction, settlement, release, and discharge of all Claims and Interests.

**ARTICLE V**
**RETENTION OF JURISDICTION**

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, to the fullest extent permissible under law, over all matters arising out of and related to the Chapter 11 Case for, among other things, the following purposes:

a)     To hear and determine all matters with respect to the assumption or rejection of executory contracts or unexpired leases and the allowance of cure amounts and Claims resulting therefrom;

b)     To hear and determine any motion, adversary proceeding, application, contested matter or other litigated matter pending on or commenced after the Confirmation Date;

c)     To hear and determine all matters with respect to the allowance, disallowance, liquidation, classification, priority or estimation of any Claim;

d)     To ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan;

e)     To hear and determine all applications for compensation and reimbursement of Professional Fee Claims;

f)     To hear and determine any application to modify the Plan in accordance with Section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, this Disclosure Statement or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

-14-

g)      To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated by the Plan or any agreement, instrument or other document governing or relating to any of the foregoing;

h)      To issue injunctions, enter and implement other orders and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

i)      To issue orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan;

j)      To enter, implement or enforce orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

k)      To hear and determine matters concerning state, local and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of tax under Section 505(b) of the Bankruptcy Code);

l)      To hear and determine any other matters related to the Plan and not inconsistent with the Bankruptcy Code;

m)      To determine any other matters that may arise in connection with or are related to the Plan, this Disclosure Statement, the Confirmation Order, any of the Plan documents or any other contract, instrument, release or other agreement or document related to the Plan and this Disclosure Statement;

n)      To recover all assets of the Debtor and property of the Debtor's Estate, wherever located;

o)      To hear and determine all disputes involving the existence, nature or scope of the Debtor's discharge, including any dispute relating to any liability arising out of the

-15-

termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

p) To hear and determine any rights, claims or Causes of Action held by or accruing to the Debtor or the Reorganized Debtor pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

q) To enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Debtor's Chapter 11 Case with respect to any Person;

r) To hear and determine any disputes arising in connection with the interpretation, implementation or enforcement of any post-petition agreements;

s) To hear any other matter not inconsistent with the Bankruptcy Code; and

t) To enter a final decree closing the Chapter 11 Case.

**ARTICLE VI**
**EFFECT OF CONFIRMATION**

**6.1.** <u>**Vesting of Assets**</u>

Upon the Effective Date, pursuant to Sections 1141(b) and (c) of the Bankruptcy Code, all Property of the Debtor and of the Estate, (including the Debtor's and the hospital's right and privileges), except for the Effective Date cash payment to the Creditor Trust and the Causes of Action which shall vest in the Creditor Trust, shall vest in the Reorganized Debtor, free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as otherwise expressly provided in the Plan. All Liens, Claims, encumbrances, charges, and other interests shall be deemed fully released and discharged as of the Effective Date, except as otherwise provided in the Plan. As of the Effective Date, the Reorganized Debtor may operate the business and may use, acquire, and dispose of Property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the

-16-

Bankruptcy Rules and in all respects as if there was no pending cases under any chapter or provision of the Bankruptcy Code.

Upon the Effective Date, the Effective Date cash and Causes of Action shall vest in the Creditor Trust in accordance with the Plan and Creditor Trust Agreement free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as otherwise expressly provided in the Plan and the Creditor Trust Agreement. All Liens, Claims, encumbrances, charges, and other interests shall be deemed fully released and discharges as of the Effective Date except as otherwise provided in the Plan and the Plan Trust Agreement.

**6.2.** **Preservation of Causes of Action**

    **A.** **Claims against Gilbert Hospital**

        **1.** **Preference Payments**

On April 30, 2012 and June 6, 2012, respectively, FHA made transfers of $1,000,000 and $1,216,748.14 to GH (the "Preference Payments"). The Preference Payments were made on account of a prior loan extended by GH to FHA. FHA believes that it was insolvent at the time the Preference Payments were made, and that the Preference Payments allowed the Debtor to receive more than it would have received had the Preference Payments not been made, and FHA were liquidated under Chapter 7 of the United States Bankruptcy Code. The Preference Payments were made to the Debtor within the one year preceding the filing of FHA's bankruptcy petition, and given the extent of their interrelationships, GH was, and is, an "insider" of FHA, as that term is defined in 11 U. S. C. § 101(31). As such, the Committee believes that the Preference Payments to GH constitute avoidable preferences under 11 U.S.C. § 547, that GH is therefore indebted to FHA in the amount of $2,216,748.14, and that GH is not entitled to the allowance or payment of any claim in its favor in FHA's bankruptcy proceedings unless and until the amount of the Preference Payments are paid over to FHA. The Committee does not believe GH has any defenses to this claim.

### 2. Misappropriated Funds

In the course of their prior dealings, payments from patients and insurance companies attributable to goods and services provided by FHA would be delivered to GH, and then directed to FHA's accounts. FHA has reviewed its records and determined that at least $46,593.44 in payments which should have been directed to FHA's accounts, were improperly deposited in GH's accounts. GH has ignored all demands for the return of the funds. These payments are the property of FHA and have been improperly converted by the GH. GH holds these funds, and any similarly misappropriated funds, in trust for FHA's benefit, and FHA reserves the right to take any action necessary to compel the transfer of these funds to FHA. The Committee believes GH disputes these allegations.

### 3. Administrative Expenses

As outlined in the Disclosure Statement the administrative services provided by GH to FHA were substandard and mischarged and misallocated all of which caused damage to FHA.

### B. Claims against other parties

The following Causes of Action are specifically preserved:

(1) Those Causes of Action asserted in Adversary Case Number 4-15-ap-00164 against multiple defendants to avoid and recover fraudulent transfers in connection with the Defendants' respective redemption, or purported redemption, of their membership interests in the Debtor.

(2) Those Causes of Action asserted in Adversary 4-13-ap-00765 against Bank SNB to avoid and recover prepetition transfers. (The Committee notes that the matter has been settled but the settlement has not been approved by the Court).

(3) Those Causes of Action which may exist against Dr. Johns, Peoria Regional Medical Center, LLC ("Peoria"); Buckeye Regional Medical Center, LLC ("Buckeye");

Visionary Health, LLC ("Visionary"); and FHAD Property, LLC ("FHAD") and their respective officers and directors to avoid and recover prepetition transfers all as outlined in Article III of the Disclosure Statement.

(4)    Former management of FHA and the management and officers and directors of Gilbert Hospital related to the mismanagement of FHA all as outlined in Article III of the Disclosure Statement.

Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtor, the Reorganized Debtor, or the Plan Trust may have or choose to assert under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, and including without limitation any crossclaim, counterclaim, and/or claim for setoff that seeks affirmative relief against the Debtor, the Reorganized Debtor, the Plan Trust or its officers, directors or representatives. All Causes of Action shall vest on the Effective Date in the Creditor Trust

**6.3.    <u>Exculpation and Release</u>**

Pursuant to the Plan, the Debtor, the Committee, the Reorganized Debtor, and the PCO and all of their  respective present and former partners, members, officers, directors, employees, advisors, attorneys and agents (collectively, the "<u>Released Parties</u>")  shall not have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or Affiliates, or any of their successors or assigns for any act or omission in connection with, relating to or arising out of this Chapter 11 Case, any settlement related to this Chapter 11 Case, the negotiation and execution of a proposed Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Estate or of the Plan, issuance and distribution of any securities issued or to be issued pursuant to the Plan, or the Property to be distributed under

-19-

the Plan, except only to the extent that liability is based on willful misconduct. The Released Parties shall be entitled to reasonably rely on the advice of counsel with respect to their duties and responsibilities under the Plan, or in the context of the Chapter 11 Case.

No other releases of third parties are intended by this Plan.

**6.4.    Discharge and Injunction**

Except as otherwise specifically provided in the Plan or in the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made under the Plan shall discharge all existing debts and Claims, and shall terminate all interests of any kind, nature, or description whatsoever against or in the Reorganized Debtor or Creditor Trust or any of its assets or properties to the fullest extent permitted by Section 1141 of the Bankruptcy Code. Except as otherwise specifically provided in the Plan or in the Confirmation Order, upon the Effective Date, all existing Claims against the Debtor and interests in the Debtor shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Interests (and all representatives, trustees, or agents on behalf of each holder) shall be precluded and enjoined from asserting against the Debtor, the Reorganized Debtor, the Creditor Trust, the Plan Trustee, their respective successors or assignees, or any of their assets or properties, any other or further Claim or Interest based on any act or omission, transaction, or other activity of any kind or nature that occurred before the Effective Date, whether or not the holder has filed a Proof of Claim and whether or not the facts or legal bases therefor were known or existed before the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims against, liabilities of, and Interests in the Debtor, subject to the occurrence of the Effective Date.

Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise provided in the Plan, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any Affiliate of the

holder shall be deemed to have forever waived, released, and discharged the Debtor and the Reorganized Debtor, to the fullest extent permitted by Section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose before the Effective Date. Upon the Effective Date, all those Persons shall be forever precluded and enjoined, pursuant to Section 524 of the Bankruptcy Code, from prosecuting or asserting any discharged Claim against or terminated Interest in the Debtor.

Except as otherwise expressly provided in the Plan, all persons or entities who have held, hold, or may hold Claims or Interests and all other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, representatives, and Affiliates, are permanently enjoined, from and after the Effective Date, from: (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Interest; (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtor, the Reorganized Debtor, the Creditor Trust or Plan Trustee or property of the Debtor; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against the Debtor, the Reorganized Debtor, the Creditor Trust or Plan Trustee, or against the property or interests in property of the Debtor; or (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtor the Reorganized Debtor, the Creditor Trust or Plan Trustee, or against the property or interests in property of the Debtor, with respect to any such Claim or Interest. This injunction shall extend to any successors or assignees of the Debtor, Debtor, the Reorganized Debtor, the Creditor Trust or Plan Trustee, and their respective properties and interests in properties.

**6.5.** **Setoff and Recoupment**

The Creditor Trust may, but shall not be required to, setoff or recoup against any Claim and any distribution to be made on account of that Claim, any and all claims, rights,

and Causes of Action of any nature that the Creditor Trust may have against the holder of that Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; provided, however, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim under the Plan shall constitute a waiver, abandonment, or release by the Creditor Trust of any such claims, rights, and Causes of Action that the Creditor Trust may have against the holder of the Claim. To the extent the Creditor Trust fails to setoff or recoup against a holder and seek to collect a claim from that holder after a distribution to the holder pursuant to the Plan, the Creditor Trust shall be entitled to full recovery on its claim against that holder of a Claim.

## 6.6.  Compromise and Settlement of Claims and Controversies

Pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise of all Claims, Causes of Action, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim may have with respect to any Allowed Claim, or any distribution to be made on account of that Allowed Claim. In each case, the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all those Claims or controversies and the Bankruptcy Court's finding that the compromise or settlement is in the best interests of the Debtor, its Estate, and the holders of those Claims and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice, action, order, or approval of the Bankruptcy Court, the Creditor Trust may compromise and settle Claims and Causes of Action, in its sole and absolute discretion.

# ARTICLE VII
## MISCELLANEOUS PROVISIONS

**7.1.** **Binding Effect of Plan**

The provisions of this Plan shall bind the Debtor, the Creditors, and any Interest Holders, and shall bind any Person asserting a Claim against the Debtor or an Interest in the Debtor, whether or not the Claim or Interest arose before or after the Petition Date or the Effective Date, whether or not the Claim or Interest is impaired, and whether or not the Person has accepted the Plan.

**7.2.** **Appeals**

In the event of an appeal of the Confirmation Order or any other kind of review or challenge to the Confirmation Order, and provided that no stay of the effectiveness of the Confirmation Order has been entered, the Bankruptcy Court will retain jurisdiction to implement and enforce the Confirmation Order and the Plan according to their terms, including, but not limited to, jurisdiction to enter such orders regarding the Plan or the performance thereof to implement the Plan.

**7.3.** **Modification and Amendment of Exhibits, Schedules, and Appendices**

The Committee may modify or amend the terms of any document or agreement that is an Exhibit, schedule or appendix to the Plan without the need for re-solicitation of votes with respect to the Plan; provided, however, that the modification or amendment does not materially adversely affect the rights of any Person provided in the Plan and, provided further, however, that prior notice of the modification or amendment shall be served in accordance with the Bankruptcy rules or any order of the Bankruptcy Court.

**7.4.** **Governing Law**

Except to the extent the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by and construed and enforced in accordance with the laws of the State of Arizona.

-23-

**7.5.** **Headings**

The headings of the Articles, Sections and subsections of the Plan are inserted for convenience only and shall not limit the interpretation of the Plan.

**7.6.** **Amendment and Modification of the Plan**

The Committee may propose amendments to or modifications of the Plan at any time prior to confirmation of the Plan without the leave of the Bankruptcy Court or as permitted by the Bankruptcy Code or Bankruptcy Rules. After confirmation of the Plan, the Reorganized Debtor may amend or modify the Plan, with the approval of the Bankruptcy Court, so long as it does not materially or adversely affect the interests of Creditors or other parties in interest as set forth herein, to remedy any defect or omission or to reconcile any inconsistencies in the Plan or in the Confirmation Order, in a manner as may be necessary to carry out the purposes and intent of the Plan.

**7.7.** **Withdrawal of Plan**

The Plan may be withdrawn or revoked prior to the entry of the Confirmation Order at the sole discretion of the Committee.

**7.8.** **Quarterly Fees**

The quarterly fees required by 28 U.S.C. § 1930(a)(6) will be paid by the Reorganized Debtor and reports will be filed with, the Office of the United States Trustee by the Reorganized Debtor until application is made for entry of a final decree. Application for a final decree can be made when the Plan has been fully administered, which for purposes of the Plan shall mean when the Plan has been substantially consummated, as that term is defined in Section 1101(2) of the Bankruptcy Code.

DATED: May 18, 2015.

OFFICIAL COMMITTEE OF UNSECURED CREDITORS

By: /s/ Carolyn J. Johnsen _____

# EXHIBIT B

# EXHIBIT B

## DEFINITIONS

**Defined Terms**. For purposes of this Plan and the Disclosure Statement, except as expressly provided in the Plan or Disclosure Statement, or unless the context otherwise requires, all capitalized terms used in the Plan and the Disclosure Statement shall have the meanings ascribed to them below.

1.  **Administrative Claims** means claims and expenses which are allowed pursuant to Bankruptcy Code § 503(b) and which are entitled to priority pursuant to Bankruptcy Code § 507(a)(1).

2.  **Affiliate** shall have the same meaning as defined by the Bankruptcy Code § 101(2).

3.  **Allowed Claim** means a Claim: (i) with respect to which a Proof of Claim has been filed with the Bankruptcy Court within the applicable period of limitation fixed by the FED. R. BANKR. P. 3003 or otherwise established by the Bankruptcy Court; or (ii) Scheduled in the list of Creditors prepared and filed with the Bankruptcy Court pursuant to FED. R. BANKR. P. 1007(b) and not listed as disputed, contingent, or unliquidated as to amount, and in either case, as to which no objection to the allowance thereof has been filed within any applicable period of limitation fixed by FED. R. BANKR. P. 3007, the Plan, an order of the Bankruptcy Court, or as to which any such objection has been determined by an order or judgment which is no longer subject to appeal and as to which no appeal is pending. An Allowed Claim shall not include non-matured or post-petition interest, unless otherwise provided in the Plan.

4.  **Allowed Interest** means an Interest as to which no objection to the allowance thereof has been filed within any applicable period of limitation fixed under the Bankruptcy Code or Bankruptcy Rules.

1

5.      **Allowed Unsecured Claim** means a Claim that is both an Allowed Claim and an Unsecured Claim.

6.      **Allowed Secured Claim** means a Claim that is both an Allowed Claim and a Secured Claim.

7.      **Articles of Incorporation** means the Articles of Incorporation to be filed with the Arizona Corporation Commission by the Reorganized Debtor.

8.      **Avoidance Action** means a lawsuit commenced pursuant to Bankruptcy Code §§ 547, 548, 549, and/or 550 to recover for the benefit of the Estate, a transfer of property to a third party.

9.      **Ballot** means the ballot for accepting or rejecting the Plan that will be distributed to holders of Claims in Classes that are Impaired under this Plan and are entitled to vote on this Plan.

10.     **Bankruptcy Code** means the Bankruptcy Reform Act of 1978, sometimes referred to as the Bankruptcy Code of 1978, as contained in Title 11 U.S.C.A. § 101, *et seq*., and all amendments thereto.

11.     **Bankruptcy Court or Court** means the United States Bankruptcy Court for the District of Arizona, Phoenix Division, or any other court that exercises jurisdiction over all or part of the Chapter 11 Case, including the United States District Court for the District of Arizona to the extent that the reference of all or part of the Chapter 11 Case is withdrawn.

12.     **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure promulgated under 28 U.S.C. § 2075 and the Local Rules of the Bankruptcy Court, as applicable during the term of the Chapter 11 Case.

13.     **Building Lease** means the real property lease with MPT of Florence, LLC through which FHA leases the Hospital to the Debtor.

2

14.     **Business Day** means every day except Saturdays, Sundays, and holidays observed by the Bankruptcy Court.

15.     **Cash** means any legal tender of the United States.

16.     **Causes of Action** means any and all actions, proceedings, causes of action, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims (as defined in Bankruptcy Code § 101(5)), whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, non-matured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise.

17.     **Chapter 11** means chapter 11 of the Bankruptcy Code.

18.     **Chapter 11 Case** means the above-captioned Chapter 11 case of Florence Hospital at Anthem, LLC, Case No. 4:13-bk-03201-BMW.

19.     **Claim** means a right to (i) payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, non-matured, disputed, undisputed, legal, equitable, secured or unsecured; or (ii) an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, non-matured, disputed, undisputed, secured or unsecured.

20.     **Claimant** means a holder of a Claim.

21.     **Class** means one or more Creditors or Interest Holders grouped together as defined herein.  The Plan is intended to deal with all Claims against and Interests in the Debtor of whatever character, whether or not contingent or liquidated, and whether or not allowed by the Bankruptcy Court pursuant to Bankruptcy Code § 502(a).  Only those

Claims and Interests Allowed pursuant to Bankruptcy Code § 502(a), however, will receive payment under the Plan.

22.     **Collateral** means Property that is pledged as security for the satisfaction of a debt.

23.     **Confirmation** means the formal approval of the Bankruptcy Court of the Plan pursuant to Bankruptcy Code § 1129.

24.     **Confirmation Date** means the date upon which the Confirmation Order is entered by the Bankruptcy Court.

25.     **Confirmation Hearing** means the hearing regarding confirmation of the Plan conducted by the Bankruptcy Court pursuant to Bankruptcy Code § 1128, including any adjournment or continuation of that hearing from time to time.

26.     **Confirmation Order** means the Order entered by the Bankruptcy Court determining that the Plan meets the requirements of Chapter 11 of the Bankruptcy Code and is entitled to Confirmation.

27.     **Creditor** means a Person or entity holding a Claim against the Debtor for the debts, liabilities, demands, or Claims of any character whatsoever, as defined in Bankruptcy Code § 101(4).

28.     **Committee** means the Official Committee of Unsecured Creditors. appointed March 27, 2014 pursuant to Bankruptcy Code § 1102(a).

29.     **Creditor Trust** means the trust established on the Effective Date pursuant to the Plan.

30.     **Creditor Trust Agreement** means the agreement pursuant to which the Creditor Trust shall be operated.

31.     **Cure** means the distribution of Cash, or such other Property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the

assumption of an executory contract or unexpired lease, pursuant to Bankruptcy Code § 365(b), in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties, under such executory contract or unexpired lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

32. **Debtor** means Surgical Specialty Hospital of Arizona, LLC.

33. **Disclosure Statement** means the Disclosure Statement in Support of the Committee's Chapter 11 Plan of Reorganization, as it may be amended or supplemented.

34. **Disputed Claim** means a Claim against the Debtor that is not Allowed, including: (a) if no proof of Claim has been filed by the applicable bar date or has otherwise been deemed timely filed under applicable law: (i) a Claim that is listed on the Schedules as disputed, contingent or unliquidated; or (ii) a Claim that is listed on the Schedules as other than disputed, contingent or unliquidated, but as to which the Debtor, the Plan Trustee, or any other party in interest with standing to object to Claims under the Plan or applicable law, has filed an objection by the applicable Claims objection deadline under the Plan, unless such objection has been withdrawn or denied by a Final Order; or (b) if a proof of Claim or request for payment of an Administrative Claim has been filed by the applicable bar date or has otherwise been deemed timely filed under applicable law: (i) a Claim for which a corresponding Claim is listed on the Schedules as disputed, contingent or unliquidated; or (ii) a Claim for which an objection has been filed by the Debtor or the Plan Trustee to which the Claim relates, or any other party in interest with standing to object to Claims under the Plan or applicable law, by the applicable Claims objection bar date, unless such objection has been withdrawn or denied by a Final Order.

5

35.     **Disputed Claims Reserve** means the reserve of Cash established and maintained by the Plan Trustee to pay Disputed Claims upon allowance by the Bankruptcy Court.

36.     **Effective Date** means the date that is fourteen (14) days following the Confirmation Date.

37.     **Estate** mean the bankruptcy estate of the Debtor created under Bankruptcy Code § 541.

38.     **Executory Contract** means every unexpired lease and executory contract which is subject to being assumed or rejected under Bankruptcy Code § 365.

39.     **Exhibit** means any document attached to either the Plan or Disclosure Statement.

40.     **Final Order** means an order of the Bankruptcy Court that not having been reversed, modified, or amended and not being stayed, and the time to appeal from which or to seek review or rehearing of which having expired, and no such appeal, review, certiorari or rehearing is pending, has become conclusive of all matters adjudicated thereby and in full force and effect.

41.     **Government Entity** means any government or any agency, bureau, board, directorate, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local.

42.     **Hospital** means the Florence Hospital at Anthem, the full-service hospital operated by the Debtor in Florence, Arizona.

43.     **Impaired/Impaired Class** means, under Bankruptcy Code § 1124, a Class of Claims is impaired under a Plan, unless with respect to each Claim of such Class: (i) it is paid in full on the Effective Date of the Plan; (ii) the Plan leaves unaltered the legal, equitable and contractual rights to which such Claim entitles the holder to such Claim; or

6

(iii) all defaults are cured, the original maturity of the Claim is reinstated, and the Claim is otherwise treated as provided in clause (ii) above.

44. **Interest Holder** means the holders of an Interest in the Debtor.

45. **Interest** means the equity right and interest in the Debtor.

46. **Lien** means a lien as described in Bankruptcy Code § 101(37), except for a lien that has been avoided in accordance with Bankruptcy Code §§ 544, 545, 546, 547, 548, or 549.

47. **Litigation Claims** means all rights, claims, torts, liens, liabilities, obligations, actions, Causes of Action, Avoidance Actions, avoiding powers, proceedings, debts, contracts, judgments, offsets, damages, and demands whatsoever in law or in equity whether known or unknown, contingent, or otherwise that the Debtor may have against any Person. This includes, but is not limited to, the claims discussed in the Disclosure Statement.

48. **Other Priority Claim** means any Claim against the Debtor that is entitled to priority under Section 507(a) of the Bankruptcy Code, other than Administrative Expense Claims or Priority Tax Claims.

49. **PCO** means Jerry Seelig, the patient care ombudsman appointed by the Bankruptcy Court in the Chapter 11 Case pursuant to Bankruptcy Code § 333.

50. **Person** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in Bankruptcy Code § 101(27)), or other entity (including, without limitation, the Committee).

51. **Petition Date** means March 6, 2013, which is the date on which the Debtor filed its voluntary petition.

7

52.     **Plan** means this Plan of Reorganization propounded by the Committee and every modification thereof.

53.     **Plan Confirmation** means the entry by the Bankruptcy Court of an order confirming the Plan.

54.     **Plan Supplement** means the Exhibit to be filed 10 days prior to the initial hearing on the Committee's Disclosure Statement. It will include the proposed Articles of Incorporation and By-laws for the Reorganized Debtor, Plan Projections, the Creditor Trust Agreement, the list of Assumed Contracts, the employment contract for Arthur Doloresco and the Tax Analysis.

55.     **Plan Trust Causes of Action** means the Causes of Action reserved to the Creditor Trust, including those involving capital call issues, - as well as any and all defenses that the Debtor has or may have of any kind or nature to any Claims in the Chapter 11 Case.

56.     **Plan Trustee** means David Gonzales or such other Person appointed to administer and act as trustee of the Creditor Trust.

57.     **Priority Tax Claim** means any Claim against the Debtor of a governmental unit of the kind specified in Bankruptcy Code § § 502(i) or 507(a)(8).

58.     **Pro Rata** means proportionally, so that the ratio of the consideration distributed on account of an Allowed Claim or Allowed Interest in the Class (or sub-class) and consideration distributed on account of all Allowed Claims or Allowed Interests in the Class (or sub-class) is the same as the ratio of the Allowed Claims or Allowed Interests in the Class (or sub-class).

59.     **Professional Fee Claims** means Claims of any professional employed in the Chapter 11 Case pursuant to Bankruptcy Code §§ 327 or 1103, or any professional or

other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to Bankruptcy Code §§ 503(b)(3)(F) and (b)(4).

60. **Proof of Claim** shall have the same meaning as defined by FED. R. BANKR. P. 3001(a).

61. **Property** means all rights, title, privileges, and interests of the Estate in any and all real and personal property (individually or as a whole) as previously or hereafter determined by Final Order of a court of competent jurisdiction and/or as defined in § 541 of the Bankruptcy Code, including, but not limited to, all of the Debtor's rights, title, privileges, and other interests in, to, or under the Hospital's Medicare provider agreement and provider number.

62. **Proponent** means the Committee who is proposing the Plan.

63. **Reorganized Debtor** means the Debtor, on and after the Effective Date of the Plan, and its successors and assigns.

64. **Reorganized Debtor Interests** means the equity Interests to be issued by the Reorganized Debtor, which Interests shall be issued in a number of units to be determined by the Plan Trustee pursuant to the Plan and the Creditor Trust Agreement.

65. **Scheduled** means any Claim or Interest, the status, priority and amount, if any, of such Claim or Interest as set forth in the Schedules.

66. **Schedules** means the schedules of assets and liabilities and the statement of affairs filed in the Chapter 11 Case by the Debtor, as such schedules or statement has been or may be amended or supplemented from time to time in accordance with FED R. BANKR. P. 1009 or orders of the Bankruptcy Court.

67. **Secured Claim** means the portion of any Claim against the Debtor, (a) determined in accordance with the Bankruptcy Code § 506(a), as of the Confirmation Date, secured by a valid, perfected and unavoidable Lien, to the extent of the value of the

holder's interest in the Debtor's interest in the subject Collateral; or (b) subject to offset under the Bankruptcy Code § 553, to the extent of the amount subject to offset.

68. **Unsecured Claim(s)** means any Claims not secured by Collateral of the Estate.

69. **Unsecured Creditor(s)** means any Creditor(s) of the Debtor holding Unsecured Claims of any character whatsoever, except Claims entitled to priority pursuant to Bankruptcy Code § 507.

**Undefined Terms.** Terms and phrases, whether capitalized or not, that are used and not defined herein, but are defined by the Bankruptcy Code, have the meanings ascribed to them in the Bankruptcy Code. Terms and phrases, whether capitalized or not, not defined herein and not defined by the Bankruptcy Code, but which have been defined by motions and orders filed in this Chapter 11 case have the meaning ascribed to them in such motions and orders.

**Rules of Interpretation**. For purposes of this Plan: (i) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that it shall be substantially in such form or substantially on such terms and conditions; (ii) any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented; (iii) unless otherwise specified, all references in the Plan to Sections, Articles, Appendices, Schedules, and Exhibits are to the Sections, Articles, Appendices, Schedules, and Exhibits of or to the Plan; (iv) the words "herein" or "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (v) the headings and captions used in this Plan are for convenience and reference only and are not intended to be a part of or affect the interpretation of the Plan and shall not limit or otherwise affect the provisions hereof; (vi)

10

words denoting the singular number shall include the plural number and vice versa; (vii) words denoting one gender shall include the other gender; (viii) the word "including" shall mean "including without limitation"; and (ix) the rules of construction set forth in Bankruptcy Code § 102 and in the Bankruptcy Rules shall apply.

**Computation of Time**. In computing any period of time prescribed by or allowed by the Plan, the provisions of FED. R. BANKR. P. 9006(a) shall apply.

PHOENIX 99999-100 220414v1

Case 4:13-bk-03201-BMW   Doc 859   Filed 05/18/15   Entered 05/18/15 17:51:09   Desc
Main Document     Page 99 of 99